THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH JENNINGS, Defendant-Appellant.

Second District   No. 2—92—0091

Opinion filed December 28, 1993.—Rehearing denied January 28, 1994.

McLAREN, J., dissenting.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

After a jury trial, defendant, Joseph Jennings, was found guilty of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14(b)(1) (West 1992))) and was sentenced to 10 years' imprisonment. On appeal, defendant raises two issues: (1) whether he was denied a fair trial due to prosecutorial misconduct; and (2) whether the trial court abused its discretion in withholding certain confidential records from defendant.

At the time of the offense, defendant was living with his girlfriend, Sandra, and her three children. An investigator from the Department of Children and Family Services (DCFS), Karel Dunlap, went to the home where the couple resided on March 26, 1990, to interview Sandra and the children regarding a complaint that Sandra had been providing alcohol to her children. After interviewing Sandra, Dunlap questioned the youngest child, J.S. After talking with Dunlap,

16

the child asked Dunlap if she could tell Dunlap a secret. J.S. then told Dunlap that defendant had made her "suck his you know what." She told Dunlap that defendant made her watch dirty movies, defendant had anal intercourse with her, and defendant made her perform oral sex.

After hearing the allegations, Dunlap took J.S. to the Machesny Park police station, where J.S. was interviewed by Dunlap and Detective James Thompkins. J.S. told her interviewers that the abuse had been going on for about three years, since she was five years old. According to J.S., the incidents usually took place after her mother left for work in the morning and J.S.'s brother and sister left for school. J.S. stated that the most recent incident occurred on March 23, 1990, at 7:30 a.m., when defendant had her remove her clothes and he anally penetrated her.

At trial, J.S. testified that defendant forced her to have anal intercourse on March 23, 1990, from 8 to 8:30 a.m., after her mother and siblings had left. Her first memory of abuse was when she was five or six years old. She had been sitting on defendant's lap when he fondled her genital area through her clothes. She asked defendant if he knew where his hands were, and he stated he did and questioned whether it was all right. J.S. stated that she told defendant it was all right because she did not know better. J.S. estimated that defendant made her perform oral sex on him approximately four times and anally penetrated her approximately four times over the subsequent period of abuse. Defendant would play the videotape of "The Devil and Miss Jones" while engaging in anal intercourse with J.S.

J.S. testified about a particular incident in the summer of 1989 when defendant took her fishing. Defendant forced J.S. to perform oral sex on him, and J.S. testified that she vomited when defendant ejaculated in her mouth. The first time he abused her, defendant told J.S. not to tell anyone about the incident because he would get into trouble.

On cross-examination J.S. testified that her parents had divorced when she was two years old and that she would like her mother and father to be living together. She admitted that she resented Joe moving in with her family and sometimes she would become angry when Joe disciplined her. J.S. denied that a few days before she told Karel Dunlap of the abuse she had been angry with Joe for denying her request to buy a stuffed animal. J.S. did not remember watching an X-rated movie with her brother.

Sandra, J.S.'s mother, corroborated J.S.'s testimony regarding the times that she and J.S.'s siblings left the house in the morning. She

stated that J.S. was removed from her house because she, Sandra, had "denied her."

Detective James Thompkins testified to J.S.'s statements during the interview at the police station on March 26, 1990. Thompkins stated that he had not heard of Leon Jamison, Richard Harris or Tina Larson during the investigation, but he learned of Jamison and Larson approximately a week before trial. Thompkins stated that after he arrested defendant, defendant told Thompkins that he had been at Granny's Restaurant on March 23, 1990. Defendant denied abusing J.S. Defendant never furnished the names of the people who were with him at the restaurant, and Thompkins never asked him for their names.

Leon Jamison, defendant's stepfather, testified that on the morning of March 23, 1990, defendant was with him at Granny's Restaurant from 6:30 to 8:30 a.m. Jamison admitted that he had not approached the police with this information despite the fact that he knew of defendant's arrest on the day it occurred. Jamison testified that he and members of his family met at the restaurant almost every morning, but they did not always come at the same time or in the same order. In response to questioning regarding March 19, 1990, Jamison testified that he remembered on that day that his son-in-law Gary came first and then Tina and Steve arrived at approximately 5:45 a.m.

Richard Harris, defendant's friend, also testified that defendant was at Granny's Restaurant at about 8:20 a.m. on March 23, 1990. Harris remembered that defendant left the restaurant at about 8:25 a.m. Defendant told Harris that he was going home to pay bills. Harris admitted that he had not told police this information.

Finally, Tina Larson, defendant's sister, who was also at Granny's on the morning at issue, testified that defendant was there when she arrived at 6:30 a.m. and defendant was still there when she left at 7:30 or 7:45 a.m. Larson found out about the defendant's arrest on the day it occurred, but she did not go to the police with the information that defendant had been with her. No one had ever questioned her about defendant's whereabouts on that morning.

Defendant testified that Sandra and her ex-husband had been near a reconciliation when defendant met Sandra three years earlier. According to defendant, J.S. did not like him living with her mother, and J.S. had told defendant on two occasions that she would like him to get out of the house. Defendant testified that he never had sex with J.S. and never fondled her in an inappropriate manner.

On March 24, 1990, defendant would not buy J.S. a doll she wanted. J.S. became angry with defendant, and on March 26, 1990, she called defendant names. Before J.S. left for school on March 26, defendant told J.S. she was "grounded." By "grounded," defendant meant that J.S. was not to watch television and was to stay in her bedroom after school. Defendant believed that J.S.'s allegations of sexual abuse were in retaliation for the punishment.

Defendant testified that on the morning of March 23, 1990, he was at Granny's Restaurant from 6:40 a.m. to 8:20 or 8:25 a.m. After leaving, he stopped for gas, and then went home to pick up money and bills. J.S. was not at home. Defendant admitted that he never told the police the names of the people he was with at Granny's Restaurant, but the police never asked him.

Defendant denied forcing J.S. to perform oral sex on a fishing outing. According to defendant, he picked J.S. up from school on that date because she had a fever. They fished for awhile, while waiting for Sandra to finish work. J.S. vomited because she was ill.

According to defendant, the victim's brother once watched the X-rated videos which defendant and Sandy kept in their bedroom. J.S. watched the video with her brother.

In rebuttal, Detective Thompkins testified that he had interviewed Leon Jamison on October 31, 1991, a week before trial, and Jamison had told him that he was with defendant on March 23, but he did not know what year. Thompkins also testified that defendant told Thompkins that when he returned from the restaurant on the morning of March 23, 1990, he picked J.S. up and took her to school.

In surrebuttal, defendant testified that he did take J.S. to school, but he picked her up on a corner as she made her way to school. He took her the rest of the way because it was raining.

Defendant's first issue on appeal is whether his conviction should be reversed because he did not get a fair trial due to prosecutorial misconduct. The misconduct alleged ranged from improper impeachment to improper closing argument.

Defendant contends that the cross-examination of the defense witnesses, Leon Jamison, Richard Harris and Tina Larson, regarding their failure to go to the police with information regarding defendant's alibi, was improper and prejudicial. Defendant argues that this improper impeachment was compounded by the prosecutor's numerous references to defendant's "secret" alibi.

The failure to speak to police of relevant information may serve as proper impeachment if it is shown that the witness had an opportunity to make a statement and that, under the circumstances, a person

would normally make a statement. (*People v. McMath* (1968), 104 Ill. App. 2d 302, 315, *aff'd* (1970), 45 Ill. 2d 33.) Where an alibi witness is a friend or member of defendant's family, the State may properly impeach the witness regarding his failure to go to the police with information supporting defendant's alibi. (*People v. Knott* (1991), 224 Ill. App. 3d 236, 255; *People v. Ortiz* (1990), 207 Ill. App. 3d 1, 9.) However, the prosecution must lay a foundation for the impeachment. See *People v. Watson* (1981), 94 Ill. App. 3d 550, 558.

██ The prosecutor established that Jamison and Larson were related to defendant and knew of his arrest for the offense on the day it occurred. Thus, a sufficient foundation was laid for impeachment with their failure to contact the police with their information. However, the prosecutor did not elicit when Harris became aware of defendant's arrest, and there is no indication that the police questioned him regarding his knowledge. Therefore, there was an insufficient foundation laid for impeaching Harris with his silence. (*See People v. Conley* (1989), 187 Ill. App. 3d 234, 245.) Nonetheless, we hold that this error was harmless since our review of the totality of the evidence leads us to conclude that a trial without the error would not have produced a different result. See *Conley*, 187 Ill. App. 3d at 245.

Defendant further argues that the prosecutor's closing argument did not merely reiterate the failure of the alibi witnesses to approach the police with their information, but intimated that the defendant had kept the same witnesses a secret. During closing argument, the prosecutor stated that the police did not know of the alibi witnesses until a week before trial "when we found out." The prosecutor continued in the same vein. The prosecutor began, "A week ago we found out that," at which point defense counsel interrupted with an objection. Defense counsel argued that the argument was improper and inaccurate, but the objection was overruled. The prosecutor then continued to argue that "we," implying the State's Attorney's office, had found out only a week before trial that Leon Jamison and Richard Harris had information supporting an alibi defense. The prosecutor contended that the alibi was kept a "secret" from the police, when in fact no foundation had been laid for impeaching Harris in this manner.

It is improper for a prosecutor to state as evidence facts which are not supported by the record. (*People v. Watson*, 94 Ill. App. 3d at 557.) "Such argument constitutes unsworn testimony by a witness who is not subject to cross-examination, and it is not compatible with a fair criminal justice system." (*Watson*, 94 Ill. App. 3d at 557.) The record shows that on May 28, 1991, approximately five months prior

to trial, defense counsel asked for a continuance to interview three alibi witnesses whose names had just been turned over by the defendant. Defense counsel stated to the court that he had explained the need for the continuance to the prosecutor and had turned over the names of the alibi witnesses to the State a week earlier. At no time did the prosecutor refute these statements. This court could fairly infer that the three names turned over to the State five months prior to trial were the names of the three alibi witnesses who testified at trial. Defendant's alibi had always been that he was at Granny's Restaurant at the time of the alleged abuse, and the three witnesses presented all claimed to have been with defendant at the restaurant. However, defendant's answer to discovery, which presumably disclosed these witnesses, is not in the common-law record. Without a complete record, there is no way to assure that the names turned over five months before trial were those of the alibi witnesses at trial. The appellant has the duty to present a complete record on appeal. (*Salazar v. Wiley Sanders Trucking Co.* (1991), 216 Ill. App. 3d 863, 868.) In the absence thereof, any doubts will be resolved against the appellant. (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 392.) Accordingly, we conclude that the prosecutor's comments are not necessarily inaccurate and do not amount to anything more than harmless error.

■ Defendant also contends that numerous improper comments were made by the prosecutor during closing argument. Defendant argues that the prosecutor misstated the evidence when she stated that J.S. remembered the fishing incident because it was the first time that defendant made her swallow his semen and it made her vomit. Defendant characterizes the prosecutor's argument as an obvious attempt to bolster J.S.'s credibility because J.S. did not testify that it was the first time such a thing had occurred. Defense counsel did not object to this comment as is required in order to preserve an argument for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) We will not consider the error under the plain error doctrine (see 134 Ill. 2d R. 615(a)) unless the error is so prejudicial that real justice has been denied or that the verdict of the jury may have resulted from the error. (*People v. Johnson* (1986), 114 Ill. 2d 170, 198.) Since we do not consider the prosecutor's statement to have affected substantial rights of defendant or to have denied the defendant a fair trial, we hold that defendant waived this issue on appeal.

The next alleged error was a portion of the prosecutor's closing argument which, according to defendant, was designed only to inflame the passions of the jury. Specifically, the prosecutor stated that J.S.'s childhood had been taken from her. The prosecutor argued:

"She doesn't have that innocence. She's not naive anymore, and we know why, and I won't tell you it again about the actual facts. We know why she is not innocent anymore.

Our focus has been on the past, about what has happened to J.S. in the past. What is going to happen to her in the future when she has her first consensual sexual relationship? Is his face going to flash before her because when she was five he began touching her vagina and when she grew up to the age of eight he was anally penetrating her? How horrible. How awful that this man did this to her.

I would ask you to give her a message, give her a sign that we in society will not put up with adults having sex with children. It is unacceptable, and it is what he did. J.S. is asking, 'Will anybody believe me?' Before she tells, 'Will anybody support me? Will they be on my side?' You can be on her side. You can believe what she said."

We again note that defense counsel did not interpose an objection to these comments. Under the plain error doctrine analysis, we hold that defendant also waived this issue on appeal. See *Enoch*, 122 Ill. 2d at 186.

The other portion of the prosecutor's comments set forth above invited the jurors to send a message that adults will not be allowed to have sex with children by finding defendant guilty. A prosecutor may address the problem of crime and the duty of the jurors to fearlessly administer the law. (*People v. Fisher* (1988), 169 Ill. App. 3d 785, 788.) This remark was not improper.

Defendant contends that the prosecutor's reference to defendant as a "pervert" was also improper. Defense counsel did not object to this characterization. While we do not condone name calling as proper closing argument, the use of the word "pervert" to describe a man who has forced sex on a child is a fair comment. The prosecutor has the right to assume the truth of the evidence offered by the People. *People v. Smith* (1977), 52 Ill. App. 3d 583, 590.

Defendant further contends that the prosecutor misrepresented the evidence when she argued that J.S. had no motive to lie and that, in fact, J.S. did have a motive to lie. That is, J.S. wanted to have defendant removed from the home so that her father might return and J.S.'s act was one of vengeance for defendant's acts of discipline against her. We find any error in this regard to be harmless because defense counsel forcefully argued his theory of J.S.'s motivation to lie to the jurors.

Finally, as to the prosecutor's argument that J.S.'s testimony had a ring of truth to it because she did not back down even though her accu-

sations resulted in her removal from her home and her mother, we do not agree with defendant that this comment was unsupported by the record. The evidence shows that defendant last lived with J.S. on March 26, 1990, the date on which J.S. made the allegations of abuse. Furthermore, her mother stated that J.S. was removed from her home because she, Sandra, "denied her." We believe that the prosecutor's argument was based upon a fair inference from the evidence that J.S. was removed due to the allegations of abuse by defendant. In closing argument, a prosecutor is entitled to comment on the evidence and to draw any legitimate inference from the evidence. (*People v. Garcia* (1992), 231 Ill. App. 3d 460.) We conclude that the comments in the prosecutor's closing argument did not constitute reversible error.

■ Defendant next requests that this court review the records from DCFS and Family Advocate to determine if the trial court abused its discretion in refusing to turn over all of the records. In preparing for trial, defense counsel requested discovery of reports compiled by DCFS and Family Advocate. After reviewing the records *in camera*, Judge John Sype released certain DCFS materials, but ruled the remaining records were not discoverable. Later, Judge Robert Coplan reviewed the records *de novo* and released additional DCFS reports.

We granted defendant's motion to compel the Winnebago County circuit court to produce the DCFS and Family Advocate records for this court's inspection. These records are confidential and generally they are not to be disclosed. (Ill. Rev. Stat. 1991, ch. 23, par. 2061 (now 325 ILCS 5/11 (West 1992)).) The right to confront and cross-examine does not entitle defendant to full access to confidential records in the hope of finding impeaching material. (*People v. Bean* (1990), 137 Ill. 2d 65, 100.) We have examined the records and cannot say that the trial court abused its discretion, manifestly prejudicing defendant. See *Bean*, 137 Ill. 2d at 102.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

BOWMAN, J., concurs.

JUSTICE McLAREN, dissenting:

I respectfully dissent. I believe that the State committed reversible error when it argued, over objection, that the State had learned only a week before trial that defendant had an alibi defense. The prosecutor contended that the alibi was kept a "secret" from the police when in

fact the police were made aware of the alibi defense by defendant's statement made to an investigating officer on the date the defendant was arrested. The majority states on page 3 of its opinion that Officer Thompkins stated that after he arrested defendant, defendant told Thompkins that he "had been at Granny's Restaurant on March 23, 1990." (See 254 Ill. App. 3d at 17.) The police were, in fact, made aware that there was an alibi defense on the day that the defendant was arrested, and the State's Attorney's office was told of the alibi defense at least five months prior to trial. To allow the State to argue that the alibi defense was a "secret" until one week prior to trial is not supported by either the State's own witnesses or the record. Whether the record reflects which three alibi witnesses were or were not going to testify is not, in my opinion, ameliorating.

This was a closely balanced case because the only evidence to convict the defendant was the testimony of the victim. The victim's testimony had to be weighed against the testimony of the defendant and his alibi witnesses, and the jury had to consider the weight and credibility of all the witnesses in determining whether the defendant was guilty beyond a reasonable doubt.

I believe the trial court denied the defendant a fair trial by allowing the State to argue, over objection, that the alibi was fabricated because the State was not made aware of any "secret" alibi defense until one week prior to trial. The record does not support such an egregious representation. To the contrary, "we," as the State described itself, knew of the alibi defense on the day that the defendant was arrested. I believe prejudicial error occurred because I am not confident that the jury would have returned the same verdict if the State had not so improperly destroyed the alibi defense through a closing argument that was not supported by, but rather contrary to, the evidence contained in the record.