NOTICE

Decision filed 10/06/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210061-U

NOS. 5-21-0061, 5-21-0062 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* C.W. and N.W., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Richland County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 16-JA-14 and 16-JA-15 |
| | ) | |
| | ) | |
| Venessa W., | ) | Honorable |
| | ) | Matthew J. Hartrich, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where the trial court's orders finding that Venessa was an unfit parent were not contrary to the manifest weight of the evidence, we affirm the orders. Where the trial court's orders concluding that the best interests of the minor children were served by termination of Venessa's parental rights were not manifestly erroneous, we affirm the orders.

¶ 2   Venessa W. appeals from the trial court's orders finding that she was an unfit parent and that her parental rights should be terminated. On appeal, she argues that these orders are erroneous. We affirm the trial court's orders.[1]

_____

[1]This appeal is subject to the mandatory accelerated disposition rules of Illinois Supreme Court Rule 311 (eff. July 1, 2018). The timeline for disposition can be modified for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). This case is a consolidated case of two appeals. The process of consolidation, the filing of the record

1

¶ 3                                    I. BACKGROUND

¶ 4      C.W. is a male child born on May 16, 2014. N.W. is a female child born on May 19, 2015. Venessa is the mother of both children. The children have different biological fathers. Vincent S. is the biological father of N.W. and lives in Arkansas. Levi W. is the biological father of C.W. and lives in Indiana.[2]

¶ 5      A hotline report was made regarding C.W. and N.W. after their infant brother, B.W., died at home. B.W. died at three months of age. The cause of B.W.'s death was not then known, but Venessa reported that she had placed B.W. to sleep on his stomach and next to her in bed. B.W.'s medical chart indicated that Venessa had a history of drug abuse. When taken into custody, N.W. had multiple bruises on her forehead, on the bridge of her nose, under her eyes, on her neck, on her stomach, on her back, and on her arms. When N.W.'s arm was held down by her side, the line of bruising on her arm matched up with the line of bruising on her stomach. Tiffany Wilkinson, a worker with the organization Stopping Woman Abuse Now (SWAN), informed the Illinois Department of Children and Family Services (DCFS) caseworker that she witnessed N.W. fall and hit her head on a television stand and that generally she always seemed to be bumping into things. After a full body check of C.W., no bruises were found. Venessa indicated that no one else lived in the Olney home she shared with her children. Venessa had prior incidents in both the Illinois and the Indiana departments for children services. All reports, however, were either unfounded or

---

on appeal, and an appointment of the Office of the State's Attorneys Appellate Prosecutor to represent the State resulted in a later timeline and allowed for modification of the timeline.

[2]Neither father is involved in this appeal. The trial court found that Venessa and the fathers were unfit parents in the same order. While the best interest hearings were held on February 2, 2021, in Venessa's cases, the best interest hearings for the fathers were scheduled on a later date.

unsubstantiated. Upon removal from Venessa's home, both C.W. and N.W. were placed in a traditional foster placement because no family or fictive kin were identified.

¶ 6     On November 22, 2016, the State held the shelter care hearing. The court found that there was probable cause to find that both children were neglected, and that there was an immediate and urgent necessity to remove the minors from Venessa's home because it was contrary to their welfare, safety, or best interest to remain. The court granted temporary custody to DCFS.

¶ 7     DCFS created its initial family service plan on December 29, 2016, for Venessa. Venessa self-reported criminal charges in Indiana including theft of vehicles and items from stores as well as drug-related charges. She previously served a three-month incarceration in Indiana. She participated in and graduated from drug court in 2015. As of the date of the service plan, Venessa was not then on parole or probation. Venessa had also been in Indiana foster care from the age of 14 to 18 and had a 2011 psychiatric hospitalization in Terre Haute, Indiana, from a drug overdose. She reported being sexually abused by her stepfather and raped by unknown perpetrators when she was 16. She also suffered from the absence and mental illness of her mother and physical abuse by her mother and stepfather. Venessa had been unable to maintain employment or stable housing. As of the date of the service plan, she was living in a three-bedroom apartment, but believed she was at risk of losing funding for the apartment because the children had been removed from her care.

¶ 8     DCFS had Venessa take a Child Abuse Potential Inventory test on December 13, 2016. The results revealed that Venessa was at very high risk of future child physical abuse, and she was in distress and need of assistance to address maladaptive and problematic thoughts, beliefs, or perceptions. On the same date, DCFS administered the Edinburgh Postnatal Depression Scale. From that test, DCFS found that Venessa was experiencing possible depressive symptoms.

3

¶ 9    DCFS's first service plan for Venessa included the following action steps:

(1) attend, participate, and successfully complete mental health counseling;

(2) agrees to discuss her trauma history and her subsequent emotional problems;

(3) agrees to discuss the grief and loss component to address the recent loss of her son;

(4) agrees to sign a release of information;

(5) agrees to follow the recommendations of her mental health therapist;

(6) agrees to cooperate with DCFS;

(7) agrees to notify worker within 24 hours if anyone moves in or out of the house;

(8) agrees to maintain housing;

(9) agrees to actively participate in weekly supervised visitation;

(10) agrees to provide worker monthly verification of her employment;

(11) agrees to allow the worker in her residence announced and unannounced;

(12) agrees to obtain and maintain employment;

(13) agrees to remain substance free including alcohol;

(14) agrees to complete an assessment for substance abuse if she fails a drug test;

(15) agrees to submit to random drug screens and understands a refusal is a positive test;

(16) agrees to sign a release with her substance abuse provider from Indiana so the DCFS worker can ensure she completed substance abuse treatment;

(17) agrees to attend, participate, and successfully complete a psychiatric assessment;

(18) agrees to follow the recommendation of the doctor;

(19) agrees to notify worker of medications she is taking and of all medication changes;

(20) agrees to take her medication as prescribed;

4

(21) agrees to attend, participate, and successfully complete a psychological evaluation;

(22) agrees to share background information about herself with the psychologist;

(23) agrees to follow the recommendations of the psychological service provider;

(24) agrees to sign a release of information so the psychological evaluation referral can be completed;

(25) agrees to attend, participate, and successfully complete parenting classes;

(26) agrees to disclose any issues or struggles she has with her parenting;

(27) agrees to follow the recommendations of the parenting instructor; and

(28) agrees to demonstrate her new parenting techniques during her parent/child visits.

This service plan and its action steps essentially remained the same throughout the entire time that C.W. and N.W. were under DCFS guardianship. Later in the case, DCFS added domestic violence counseling to the service plan and action steps because Venessa became involved in an abusive relationship.

¶ 10    On April 27, 2017, the court held the adjudicatory hearing. Only one witness testified at this hearing. Jamie Wells, the DCFS investigator on this case, testified about her investigation and the resulting report that she prepared. She was assigned to the case on November 18, 2016, shortly after DCFS received the hotline call following the death of infant B.W. Wells took photographs of all of the bruises on N.W.'s body. C.W. did not have any visible bruises or injuries. After the examination, she took protective custody of N.W. and C.W.

¶ 11    Wells interviewed Venessa, but she offered no explanation of how N.W. received the injuries, other than to say that N.W. fell often. She told Wells that she was the only person caring for the children. Venessa stated that she had left bruises on the children after spanking them on

5

their buttocks. A SWAN worker, Wilkinson, informed Wells that she witnessed N.W. fall and strike her forehead on a corner of a television stand, but that was the only eyewitness information about N.W.'s injuries. Wilkinson also stated that N.W. fell often. Having gathered information from a Women, Infants, and Children program (WIC) nurse, Wells was able to establish a timeline for the bruises on N.W.'s face. On November 14, 2016, the WIC nurse saw N.W. and she had no bruises on her face.

¶ 12    As Venessa was the only caregiver for N.W. during those four days, Wells indicated Venessa for a substantial risk of physical injury, environment injurious and neglectful to the health and welfare of the children, and for violence and intimidation towards her children. She also indicated Venessa for the bruises and injuries on N.W.'s body. Finally, she indicated Venessa for bone fractures[3] to B.W. based upon information received from other medical professionals. Wells testified that both C.W. and N.W. had bone scans which were negative for fractures. Although Venessa was ultimately found not responsible for B.W.'s death, Wells noted that B.W.'s cause of death was positional asphyxia which resulted from Venessa placing him on his stomach to sleep and co-sleeping with him. She noted that records of unfounded investigations involving Venessa reflect that DCFS advised her multiple times to place the children on their backs for sleep.

¶ 13    At the conclusion of the adjudicatory hearing, the trial court noted facts contained within Wells's report that he found particularly relevant. First, he noted that when the ambulance arrived at Venessa's home on November 18, 2016, EMT Jeff Johnson noted that B.W. had been deceased for some time. In addition, as later learned, B.W. had a fracture of the radius bone in his left forearm. The court noted that even though DCFS found that B.W.'s death was not caused by

---

[3]Initially, medical evidence indicated that B.W. had more than one fracture, but later in the final report, it was determined that he sustained only one fracture.

Venessa, that finding did not mean that Venessa had not committed neglectful acts to B.W. Wells's report also included information from WIC nurse, Deb Doan, that on October 24, 2016, Venessa informed her that B.W. slept on his stomach. Doan attempted to educate Venessa about the need for B.W. to sleep on his back and the risk of sudden infant death syndrome if he continued to sleep on his stomach. The court also found that B.W.'s fracture discovered after his death was highly suspicious. The court stated that it was nonsensical that Venessa, the only caregiver for C.W. and N.W., would have no idea how N.W. came to have so many bruises. Two sets of the bruises—the abdomen/arm and the face—were in a straight-line pattern. The court cited to *In re R.G.*, 2012 IL App (1st) 120193, which stated that there was statutory support that physical injury by "other than accidental" does not require a specific intent to harm the child. The court stated that at this adjudicatory level, the question is not if the parent abused the minor but whether the minor was abused. The court concluded that the State met its burden of proof by a preponderance of the evidence based upon the facts presented at the hearing and in the indicated reports that C.W. and N.W. were at substantial risk of physical injury.

¶ 14    On May 18, 2017, the trial court held a dispositional hearing. Venessa had passed two random drug tests, and so DCFS did not mandate that she undergo a substance abuse assessment. She had been prescribed medication by the psychiatrist, but she had inconsistently taken the medication as prescribed. She was in psychological counseling but had much more work to do. Venessa was then employed with two jobs. Venessa had completed parenting classes, but DCFS found that her parenting abilities still needed improvement. C.W. and N.W. had been in three placements since entering care. The court found that Venessa was unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor children, and maintained guardianship and custody of the minor children with DCFS.

7

¶ 15    DCFS filed a status hearing report dated July 24, 2017, in preparation for a status hearing scheduled for August 17, 2017. As of that date, Venessa was in a relationship with a man named Brian who had a pending child endangerment charge to his biological children. Venessa had quit one of her two jobs. She was not following the prescription medication guidelines. Visitation with her children continued to be problematic as Venessa maintained little structure during her visits and wanted to allow the children to watch inappropriate movies. She overslept for one visit on July 5, 2017, and she called DCFS in a panic. A DCFS aide observed and commented that Venessa was behaving differently that same day. Law enforcement responded to Venessa's home at her request due to a separate harassment issue, and the officer believed that Venessa's behaviors suggested that she was at the end of a drug binge. DCFS asked Venessa to submit to a random drug test on July 7, 2017, but she did not appear, stating that she was in Indiana. After that date, visits with the children were moved to the DCFS office. For the past couple of months preceding the report, Venessa had become increasingly combative with DCFS workers. On July 21, DCFS scheduled another random drug test. At that request, Venessa admitted that she had consumed alcohol and hydrocodone. She stated that the hydrocodone had been prescribed for her after her June 2017 surgery, but she no longer had the prescription bottle. Based on these admissions, DCFS requested that Venessa complete a substance abuse assessment.

¶ 16    On October 6, 2017, DCFS filed its permanency hearing report with the court. DCFS reported that Venessa's paramour, Brian, had been arrested twice for aggravated battery for domestic violence incidents involving Venessa. Venessa was arrested at the second of the two incidents for obstruction of justice for providing false information. Venessa showed up for a visit with her children and exhibited two black eyes. At this point, DCFS informed Venessa that she needed to complete domestic violence victimization services. As of the date of the report, Venessa

had only missed one of her weekly visits with her children. The permanency goal was to return the children home within 12 months.

¶ 17    DCFS filed its October 30, 2017, service plan with the court on January 4, 2018. In this plan, DCFS rated Venessa's progress on her service plan action steps as unsatisfactory, noting that while she was engaging in services, there had not been any substantial demonstrated progress. C.W. was continuing to struggle in placements and with controlling his actions and behaviors. He was in his fifth foster placement at the time that the service plan was written. The court's January 11, 2018, permanency order stated that Venessa had not made reasonable and substantial progress toward returning C.W. and N.W. home. The court also ordered DCFS to help facilitate a new psychological examination for Venessa with a different examiner.

¶ 18    On June 8, 2018, DCFS filed its permanency hearing report in anticipation of a June 15, 2018, permanency hearing. DCFS indicated that Venessa had not made satisfactory progress or made reasonable efforts on her service plan action steps. All visits with the children remained supervised.

¶ 19    DCFS filed an amended report with the court on August 27, 2018. Venessa's parenting classes had been terminated due to her threats to staff. Venessa had begun utilizing the domestic violence services and had joined a victim's group. Venessa completed her second psychological evaluation. She quit going to the therapist that she had been seeing because of the distance from her home. Venessa reported that she was seeing a new therapist but did not have the therapist's name or phone number. C.W. was four years old on the date of the report and continued to struggle in foster placements. He was then in his sixth placement. DCFS recategorized C.W. as a specialized foster child because of his behaviors. N.W. was then three years of age and was doing well in her placement. Venessa was consistent with her supervised visits with the children.

However, her behavior was considered disrespectful and inappropriate by DCFS in that she would allow the children to misbehave, eat snacks before finishing their meals, and damage the walls in the room. In addition, Venessa would lock supervisors out of the room, and after hiding the baby monitor in the visitation room, Venessa stole the monitor. Both children struggled with behavioral issues and following rules immediately after each visit with Venessa upon return to their foster placements.

¶ 20     On September 7, 2018, the trial court entered a permanency order finding that Venessa had not made reasonable and substantial progress toward returning the children home. The court also found that Venessa had not achieved the goal of returning the children home because she was not completing the required services. Guardianship and custody of the two children remained with DCFS.

¶ 21     DCFS filed its November 7, 2018, service plan with the court. In summarization of Venessa's plan, DCFS noted that she had recently been arrested for aggravated battery to a peace officer and for domestic battery. As of the date of the report, she was not actively engaged in services. Upon being arrested, Venessa lost her home and her job. DCFS reported that she was currently homeless and unemployed. Venessa was rated unsatisfactory on most of her action steps, with satisfactory progress only on administrative tasks like signing documents requested by DCFS. She had admitted to using marijuana and had begun refusing mandatory drug screens. She also was not taking prescribed medication for her psychiatric care. Venessa had completed her second psychological evaluation. She was diagnosed with PTSD, and the evaluator concluded that Venessa should be considered for inpatient treatment/rehabilitation, and that she required long-term counseling.

¶ 22    DCFS next filed its January 15, 2019, service plan with the court. As of that date, Venessa continued to be homeless and unemployed. Her progress on her action steps was overall unsatisfactory. DCFS noted that Venessa had not been demonstrating her ability to avoid a violent domestic relationship that could put her children in an unsafe environment.

¶ 23    On January 31, 2019, DCFS filed its permanency hearing report with the court and reported that Venessa had not made satisfactory progress or reasonable efforts on her service plan action steps. DCFS recommended that the permanency goal be changed to substitute care pending court determination on termination of Venessa's parental rights.

¶ 24    On February 4, 2019, the State filed its motion seeking to terminate Venessa's parental rights. In that motion, the State alleged that Venessa had failed to make reasonable efforts to correct the conditions that were the basis of the removal of her children, that she failed to make reasonable progress toward the return of the minors to her care during any nine-month period following the adjudication of abuse or neglect, that she had caused extreme or repeated cruelty to the minor children, that she was unable to discharge her parental responsibilities, and that there was sufficient justification to believe that the inability to discharge parental responsibilities would extend beyond a reasonable period of time.

¶ 25    DCFS filed its status hearing report on April 5, 2019. In the report, DCFS reported that C.W. was continuing to have numerous behavioral and violent issues in school. N.W. was doing well in her placement and in prekindergarten. Venessa's mental health therapist reported that an impediment to successful completion of services was Venessa's attitude that she did not need therapy.

¶ 26    DCFS filed its April 26, 2019, service plan with the court. Venessa had secured a two-bedroom home in Olney, and she had obtained a job. She had completed domestic violence counseling. Venessa had received a prescription for medical marijuana.

¶ 27    DCFS filed a permanency hearing with the court on August 26, 2019. DCFS indicated that none of the safety threats that were present when the children were removed from the home had been eliminated. Venessa had not made satisfactory progress or reasonable efforts toward completion of her service plan action steps. DCFS noted that permanency goals could not be achieved because of a lack of progress, and that due to the age of the children, it was critical to be able to offer them permanency.

¶ 28    DCFS filed its November 1, 2019, service plan with the court. DCFS stated that Venessa would not acknowledge the safety threats or risk factors that were present. Progress on the service plan action steps remained insufficient.

¶ 29    DCFS filed its permanency hearing report with the court on February 25, 2020. DCFS reported that Venessa continued to fail to make satisfactory progress or reasonable efforts on her service plan action steps. DCFS had visited Venessa's new home and found it to be acceptable. The court noted that a woman obtained an order of protection against Venessa on October 22, 2019. Venessa had also engaged in a series of threatening events in the local DCFS office and in phone calls or interactions with DCFS and agency staff. Venessa called and yelled at a DCFS staff member on January 31, 2020, and then proceeded to call the office 33 additional times. On November 6, 2019, Venessa violently began banging on a DCFS window after she had left personal items inside. On November 5, 2019, Help at Home (a DCFS transportation agency) called because Venessa refused to wear a seat belt and exhibited a lot of possible twitching drug use related behaviors. On October 30, 2019, police were called to the DCFS office because Venessa

refused to leave. Venessa also refused to inform DCFS of the identity of a paramour in her life. In December 2019, Venessa was arrested on a warrant and charged with possession of a controlled substance. C.W. continued to have extreme behavioral difficulties and had been approved for residential care. DCFS noted that Venessa was having increased issues during supervised visits, including telling the children not to listen to the supervisors. Overall, Venessa refused to follow visit rules and accept redirection.

¶ 30    On February 24, 2020, DCFS prepared an updated report on the status of visitation. On February 19, 2020, an incident occurred at Venessa's visit, and the visit was ended early. Venessa attempted to prevent the children from leaving the room, and it was later noticed that C.W. had a mark on his body. The visit was scheduled for two hours. C.W. screamed for more than one hour of the visit. Venessa, C.W., and N.W. were all throwing items despite attempted redirection by the visitation specialist. The visit was ended when Venessa told the children that DCFS was keeping them from coming home with her. The visitation specialist intervened to end the visit, and Venessa held the children's coats above her head so that the children could not retrieve them. Venessa told the children not to go with the visitation specialist and put the children behind her in a corner of the room. The security guard asked that someone call 911. Law enforcement arrived. The children were then placed in a DCFS transport car with the visitation specialist and Venessa was outside next to the car. Venessa banged her hand on a window of the car when the visitation specialist refused to lower the car window. Venessa went back inside accompanied by law enforcement to gather her belongings. The security guard asked Venessa to clean up the room, but she refused and left it in disarray.

¶ 31    After the contentious visit, a hotline call was made due to the mark on C.W.'s body. Venessa's mental health therapist was consulted by DCFS and reported that Venessa was unstable.

13

DCFS decided that to keep the children safe, in-person visitation must be suspended. DCFS informed Venessa of this decision, and Venessa hung up on the caller. Then, Venessa began immediately sending semi-threatening text messages to a DCFS worker about the suspension of visitation.

¶ 32    On August 11, 2020, Venessa filed a petition attempting to increase visitation. A hearing was held on the petition on September 1, 2020, at which DCFS workers appeared and testified about the disturbing text messages sent by Venessa. The court denied Venessa's petition.

¶ 33    After numerous difficult interactions with Venessa, DCFS filed a petition seeking an order of protection. The petition detailed Venessa's behaviors toward DCFS workers after the September 1, 2020, hearing when the trial court denied Venessa's petition for unsupervised visitation. Venessa began persistently sending electronic messages and emails to a DCFS caseworker that showed "a disrespectful, paranoid, and irrational hostility." DCFS sought the order of protection against Venessa to stop direct communication with DCFS case management representatives, and to ask that all future interactions go through Venessa's attorney. During the hearing, Venessa testified that she grew frustrated by not having her children and that she had grown weary of the case manager "not recognizing everything" she had done. Venessa admitted that she did call the Olney Police Department and told them that she was going to go and kick down the DCFS door. Venessa testified that she really had no intent to do that act, but that DCFS "had no right taking my visit from me, and that made mad; not violent, but mad." She also testified that although she could not remember what names she called the caseworker in her emails, she did use derogatory names. Venessa acknowledged that on two occasions the Olney Police Department had to be called to the DCFS office during her visitation time. On October 30, 2020, the trial court granted DCFS's

14

petition for an order of protection. On December 30, 2020, the court entered an order that the order of protection would be enforced until October 20, 2022.

¶ 34    On November 24, 2020, the trial court held the fitness hearing and found that Venessa was unfit by clear and convincing evidence. Five witnesses testified. We will briefly summarize each witness's testimony.

¶ 35    Jamie Wells, the DCFS investigator, was called to testify. Wells has a master's degree in community counseling and as of the date of the hearing had worked for DCFS for 18 years. After DCFS received the hotline call about the death of infant B.W., the sibling of C.W. and N.W., Wells was contacted to investigate the case relative to the safety of C.W. and N.W., who were still in the home with Venessa, the mother of these three children. Wells testified consistent with the testimony she gave at the August 27, 2017, adjudicatory hearing about the bruising on N.W.'s body, about a SWAN worker witnessing N.W. fall and hit her head on a television stand, and about B.W.'s arm fracture. Wells also testified that the medical professionals who examined N.W. believed that some of her bruises were consistent with ligature marks in that N.W. may have been tied up. Venessa told Wells that she was overwhelmed with the children, and that she was the only caregiver for them. At the conclusion of the investigation after B.W.'s death, DCFS took protective custody of the children due to B.W.'s death and his reported fractures, due to the multiple bruises of concern on N.W., and due to the young ages of the children, which also placed C.W. at risk.

¶ 36    DCFS child welfare specialist, Beth Volk, was next called to testify at the fitness hearing. Volk has a bachelor's degree in social work and had also received additional training through DCFS. Volk was assigned to be Venessa's caseworker in November 2016.

¶ 37    As of the date of the hearing, Volk testified that C.W. was in a residential facility and N.W. was in a traditional foster home. C.W. was placed in the residential facility on October 14, 2020,

15

and N.W. had been in her same foster home for 3½ years. C.W. was reported to have several special needs requiring intense services due to his behavior and mental health. Specifically, C.W. was receiving individual and group therapy, intense placement services at the residential facility, and had an Individualized Education Plan. N.W. was being evaluated for an Individualized Education Plan, and she had recently been provided with mental health counseling to assist with behavioral issues.

¶ 38   As of the date of the hearing, Volk testified that Venessa had lived for approximately one year in an Olney apartment. DCFS approved the apartment. Volk testified that she believed that Venessa was then unemployed, but that Venessa's attorney may have told her that she had just been hired in a manufacturing job in early November. Prior to that potential employment, Venessa's source of income was unemployment benefits.

¶ 39   Volk testified that there had been 11 service plans prepared for Venessa, with the latest one dated November 2020. Current services recommended for Venessa were mental health counseling, parenting services, psychiatric services, substance abuse testing, and domestic violence services. The services, except for domestic violence services that was added in mid-2017, were all part of Venessa's plan since November and December 2016. On two occasions, Venessa was directed to have a psychological evaluation, and she completed both, and that action step was removed from her service plan. As of the date of the fitness hearing, Venessa was not engaged in mental health services, was not following the recommendations of her psychologist, and was not engaged in parenting classes. Although Venessa had a history of substance abuse, DCFS found that Venessa was cooperative with substance abuse services. Venessa completed domestic violence services, but DCFS continued to monitor her personal relationships with men. Volk testified that Venessa fired her mental health therapist in August of 2020 and had not resumed counseling since that time.

16

¶ 40    Volk testified that although Venessa did not always have her own home throughout the history of this case, she was never actually homeless in the sense that she was not living on the streets or in a homeless shelter. However, she did turn to friends for housing at times. Financial responsibility remained an issue, because Venessa frequently changed jobs.

¶ 41    After identifying the 11 service plans she prepared for Venessa, Volk testified that she had made unsatisfactory progress on all 11 service plans. Her ratings were based upon a review of records received from service providers, as well as interaction and in-person meetings with Venessa. Volk explained that Venessa needed to demonstrate to DCFS and other people involved with her services that she was not simply going through the motions. More specifically, Volk stated that Venessa needed to have been actively engaged in the services provided to her and to be able to exhibit that she was practicing what she had learned from these services in her daily life.

¶ 42    Volk confirmed that C.W. and N.W. had been in DCFS care for almost four years as of the date of the fitness hearing. She testified that a conservative amount of time for a parent to complete the initial service plan was 9 to 12 months. Volk testified that looking at Venessa's behavior, she had regressed over the four years. Also, throughout the four years of this case, Venessa had become rasher and began having outbursts during court proceedings, and as a result of some of those behaviors, DCFS felt that they needed to seek an order of protection against her. Overall, Volk testified that Venessa was still not close to completing her service plan objectives. Volk opined that it was unlikely that Venessa would ever complete her services.

¶ 43    Volk testified that Venessa's supervised visits with C.W. and N.W. were suspended after the February 2020 incident in a visitation room with C.W. that required police intervention, but DCFS resumed supervised visitation in April 2020 via Zoom. However, Volk testified that

17

Venessa would not follow Zoom protocol and those failures resulted in the early termination of her Zoom supervised visits on at least five occasions.

¶ 44    Rebecca Arnold, a family service specialist employed by Addus Healthcare, testified that she supervises visits between mothers and their children. Arnold testified that she had supervised Venessa's visits from July 2019 to February 2020. During these visits, there were many problems. Arnold testified that there was never any structure to the visits. She explained that toys and trash were always thrown all over the room, and that in general there was constant commotion and loudness. Arnold was present at the last in-person visit that Venessa had with her children. She described the scene as one of utter chaos with no one listening or taking any sort of direction. Police were called. Arnold called to C.W. to exit the room, but before he could exit the room, Venessa grabbed him and spun him back into the visit room. Arnold testified that Venessa became very angry when she was informed that the visit had to be ended early. Venessa allegedly told Arnold that no one could tell her what to do. During these visits, Venessa called Arnold names in front of the children to undermine her authority. Arnold testified that Venessa was good with playing with her children, but oftentimes the playing would devolve into wrestling and then hitting behaviors that Arnold said were not appropriate.

¶ 45    The State also called Rachel Henson, another Addus Healthcare visitation supervisor. Henson testified that she had known Venessa for approximately three years. During those three years, she sometimes supervised her visits, but also provided her with parenting services. Over the time that she worked with Venessa, Rachel testified that Venessa became more defensive and aggressive and would not comply with the parenting changes recommended. Henson testified that in the last parenting session she had with Venessa, she had become verbally aggressive, stating that she would not change her parenting style for DCFS and that she would continue to parent the

18

way that she wanted to parent. Henson was pulled out of the parenting session by her supervisor who indicated that, based upon what had transpired during this session, Henson could no longer conduct parenting sessions with Venessa without another worker being present for Henson's safety. During visits with her children, Venessa would get very upset with DCFS for attempting to redirect the visits to stop her and the children from engaging in aggressive and loud behaviors. Venessa told the children not to talk with the Addus workers, telling the children that the Addus workers were "nobody." Henson testified that these chaotic and aggressive behaviors occurred frequently.

¶ 46    Venessa testified at the fitness hearing. She testified that she currently lived in a nice two-bedroom apartment. She was then unemployed and received unemployment benefits and food stamps. She testified that she had been otherwise consistently employed during the four years of this case. Venessa testified that she did not know about the source of all of N.W.'s bruises, but that she fell down a lot, and that she thought that the straight-line bruising could have come from N.W. falling on the shower door track. She testified that she believed she had benefited from mental health therapy, but that she would not resume therapy. She quit going to her last therapist because of something she said in their last session that Venessa characterized as a betrayal. She told her therapist that the world "needed a purge," but she stated that the "purge" comment was not intended to be about DCFS or about a specific worker. On the final in-person visit in February 2020, Venessa said that DCFS ended the visit because she was talking to the children about the case. Specifically, she told the children that DCFS caseworker Volk had taken them from her care.

¶ 47    Venessa testified about her frustration with DCFS, noting that she had tried very hard, and that no matter how many certificates she achieved, DCFS was not satisfied. She testified that

19

although she had learned a lot during the four years of classes, she had never been allowed to utilize what she had learned.

¶ 48 Venessa was asked about another DCFS report about her that occurred in August 2020. Apparently, Venessa had befriended two children ages 12 and 14 who frequently had nowhere to go. For a period of four months, she would allow them to sleep over at her apartment, and if they called her because they were hungry, she would bring them food. On one night, there was an incident involving Venessa and these children, a semitruck driver, and the police. Venessa had a BB gun in her vehicle, and it had been alleged that while she was driving her vehicle, she flashed the gun at the semitruck driver. She denied that she brandished the weapon, but after the police stopped her vehicle, the police confiscated the gun. The next day, DCFS went to her apartment with concerns about the two children in her care because she was prohibited from having children in her care.

¶ 49 On December 1, 2020, the trial court entered its order finding that Venessa was an unfit parent because she had failed to make reasonable efforts to correct the conditions that were the bases for the removal of the children from her care. Specifically, the court found that she had failed to make reasonable progress during any nine-month period after the initial nine-month period following the adjudicatory hearing. In support of the court's conclusion, the court noted that the case began with the asphyxiation death of B.W. while Venessa slept next to him. This child also had an unexplained bone fracture. N.W. had multiple suspicious unexplained bruises on her body. After DCFS removed the children from Venessa's care, DCFS created 11 different service plans over the span of four years. Venessa had not adequately used the services provided to her, and DCFS rated her progress on all 11 service plans as unsatisfactory. The court commented on Venessa's decision to discontinue mental health therapy services in August 2020, even though

20

continuation of those services was mandated by DCFS. The court also noted that Venessa's behavior throughout the four years never allowed for her to have unsupervised visits with her children. The court found that Venessa was an unfit parent by clear and convincing evidence and modified the permanency goal to substitute care pending court determination of termination of parental rights.

¶ 50    On February 2, 2021, the trial court held the best interest hearing. A copy of a transcript of the best interest hearing is not in the record on appeal. On February 9, 2021, the court entered its orders terminating Venessa's parental rights to both C.W. and N.W. Venessa timely filed her notice of appeal contesting the February 9, 2021, orders terminating her parental rights.

¶ 51                                                    II. ANALYSIS

¶ 52    On appeal, Venessa argues that the trial court's orders that she was an unfit parent and that her parental rights should be terminated were erroneous.

¶ 53    Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). The procedure involves two steps. In step one, the State must prove by clear and convincing evidence that the parent is unfit as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2018); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. In step two, the State must prove by a preponderance of the evidence that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2) (West 2018); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010).

¶ 54    On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the

21

evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or if findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 55    We first review the evidence to determine if the State met its burden of proving by clear and convincing evidence that Venessa met any of the alleged definitions of an "unfit person" contained in the State's motion for termination of parental rights. The trial court determined that the State met its burden of proof that Venessa failed to make reasonable efforts and failed to make reasonable progress during any of the nine-month periods after the initial nine-month period.

¶ 56    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 57    "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1067). "The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). A parent makes reasonable progress

when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the trial court may soon be able to order the return of the minor to the parent's custody. *Id.* (citing *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22).

¶ 58 We review the evidence in this case to determine whether the trial court correctly concluded that Venessa did not make reasonable efforts to correct the conditions that resulted in the removal of C.W. and N.W. from her home. Here, the conditions that were the basis for removal of the children from the home began with their younger infant brother's death. When DCFS removed C.W. and N.W. from her home, it was discovered that N.W. had multiple suspicious bruising patterns that Venessa could not explain except to admit that she was the only caregiver for the children. Later, it was determined that before B.W. had died, he had sustained a forearm fracture.

¶ 59 DCFS created a service plan for Venessa to address the following concerns: psychiatric and psychological treatment and therapy, avoidance of substances of abuse, maintaining housing and employment, participation in weekly supervised visitation with her children, and parenting classes. Later, when Venessa engaged in a relationship that became fraught with domestic violence, DCFS added domestic violence action steps to her service plan. Throughout the four years that DCFS was managing Venessa's 11 service plans, she was continuously rated unsatisfactory. Eventually, Venessa continued to take her psychiatric medications as prescribed, and DCFS dropped the substance abuse concerns after she had obtained a prescription for medical marijuana. Venessa completed parenting classes, but she refused to incorporate the parenting skills she learned into her supervised visits.

¶ 60 Multiple visits with the children were discontinued early. Police were called to the last in-person visit, and a hotline call was made to DCFS about a mark later found on C.W.'s body. Visits were notably and consistently chaotic. Venessa continually berated staff and informed the children

23

not to follow their directions. Venessa's anger and hostility towards the process ultimately resulted in cessation of in-person visitation and in DCFS seeking an order of protection against her. Finally, although mental health therapy was something that Venessa herself claimed was beneficial, Venessa fired her provider because she felt betrayed when her therapist contacted DCFS to warn them of Venessa's threat that DCFS and its workers needed to be "purged."

¶ 61    We find that the trial court fully considered the evidence in the record and at the fitness hearing. We also find support for the court's finding in the worsening progression of Venessa's behaviors directed to anyone involved in this case. Venessa had no qualms in telling DCFS workers that she would not follow their "rules," and she told her children not to follow DCFS rules. Most recently, DCFS learned that she was taking underage children into her home. In fact, Venessa testified at the fitness hearing that she had been helping these children for an extended period. In reviewing Venessa's original service plan, we note that she was obligated to inform DCFS within 24 hours if anyone moved in or out of her home. Venessa never informed DCFS about the children. Instead DCFS learned about this situation when she was stopped by police for waving a gun at another driver. Venessa knew what she needed to accomplish to get the right to have C.W. and N.W. returned to her. Instead, Venessa continuously opted to follow her own path. We conclude that the trial court's finding that Venessa was an "unfit person" was not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 62    Having determined that the trial court correctly found that Venessa was an unfit parent, we turn to the best interest of C.W. and N.W. Termination of a parent's rights is an extreme act. *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75 (1990). A parent maintains a superior right to raise his or her own children. *Id*. Once a parent has been determined to be unfit, "the parent's rights must yield to the child's best interest." *In re Tashika F*., 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*,

24

236 Ill. 2d 329, 337-38 (2010). Until the court determines that a parent is unfit, the interests of both the parent and the child are concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship.' " *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)). After finding that a parent is unfit, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2018); *In re D.T.*, 212 Ill. 2d at 366. On appeal of a best-interest determination, we must decide whether the trial court's decision is contrary to the manifest weight of the evidence. *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006).

¶ 63     "[A]t a best-interest[ ] hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must consider several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

25

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

¶ 64    Here, there is no transcript from the fitness hearing and the trial court did not specifically identify which factors it considered in its written orders. However, the trial court's ultimate determination and order does not need to reference and discuss each factor. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 65    On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court is in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). A court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 66    In this case, the record clearly reflects that termination of Venessa's parental rights was the appropriate outcome for C.W. and N.W. At the time the children were removed from their home,

C.W. was two years of age and N.W. was one. By the date of the best interest hearing, they had lived in foster care for over four years. Both C.W. and N.W. had educational and behavioral difficulties that required special care. Both children were receiving this care within the foster care system and were safe.

¶ 67 The February 2, 2021, best interest hearing was not transcribed and is therefore not in the record on appeal. The appellant has the duty to provide a complete record on appeal. *People v. Leeper*, 317 Ill. App. 3d 475, 482 (2000); *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003). In the absence of a complete record on appeal, "the reviewing court will presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis [citations]." *Midstate Siding & Window Co.*, 204 Ill. 2d at 319. Stated differently, without a complete record, any doubts must be resolved against the appellant. *People v. Jennings*, 254 Ill. App. 3d 14, 20 (1993).

¶ 68 From the record we know that caseworker Volk and Venessa both testified at this hearing. We note that the trial court had the ability to observe the conduct and demeanor of Venessa and the witness Volk as they testified and had the ability to judge their credibility. See *Jackson v. Bowers*, 314 Ill. App. 3d 813, 818 (2000). Additionally, the trial court was familiar with this case and with the evidence. Accordingly, we conclude that the trial court's decision to terminate Venessa's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). The record on appeal does not challenge the trial court's conclusion, and so we affirm the trial court's order.

¶ 69                                III. CONCLUSION

¶ 70 For the foregoing reasons, we affirm the judgment of the circuit court of Richland County.

¶ 71    Affirmed.