# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re R.G.*, 2012 IL App (1st) 120193

---

| | |
|---|---|
| Appellate Court Caption | *In re* R.G. and A.M., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Raquel M. and Royrel G., Respondents-Appellants). |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-12-0193, 1-12-0207 cons. |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | June 11, 2012<br><br>July 12, 2012<br>September 6, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent mother's children were both neglected due to an injurious environment and abused due to a substantial risk of physical injury. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-JA-175-76; the Hon. Candace J. Fabri, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Robert C. Drizin, Assistant Public Defender, of counsel), and Law Offices of Gilbert C. Schumm, of Elk Grove Village, for appellants.

Anita M. Alvarez, State's Attorney, of Chicago (Nancy Kisicki and Jennifer Streeter, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), guardian *ad litem*.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Fitzgerald Smith and Sterba concurred in the judgment and opinion.

**OPINION**

¶ 1     A.M. was born on June 7, 2005, and his sister R.G. was born September 18, 2008. They had the same mother, but different fathers. When A.M. was just three months of age, he suffered a brain injury as a result of being severely shaken by his father, who was arrested, charged, convicted and sentenced to 10 years in prison for his conduct. The Department of Children and Family Services (DCFS), which was involved in sorting out the parenting issues in the wake of the child's permanent neurological injuries, ultimately decided to allow A.M. to remain in his mother's home, with an offer of "intact family services."

¶ 2     Subsequent to A.M.'s injury and DCFS's involvement, A.M.'s mother (Ms. M.) became involved with a man referred to herein as "Mr. G.," who fathered R.G. This man had an extensive criminal history that involved drug use and domestic battery.

¶ 3     A.M. suffered from various neurological sequelae as a result of his father's battery, including cerebral palsy, a global developmental delay, visual deficiencies and a failure to thrive. Unable to walk or crawl in any meaningful way, he is only able to move about by bouncing himself in a cross-legged position or by pulling himself rearward on his buttocks. Because of the manner in which he thrashes about, he is in need of various forms of protection to ward off injury. This obviously includes visual observation, but he also must wear a helmet at all times that he is capable of moving about.

¶ 4     Several years after the birth of his sister, A.M. again came under the supervision of DCFS, when his mother took him to LaRabida Hospital where doctors found him to have various fractures to his lower extremities, ribs and spinal vertebrae. The boy was transferred to the Comer's Children's Hospital at the University of Chicago, where diagnostic studies

confirmed the existence of the various fractures in various states of healing.

¶ 5    These findings led the State of Illinois to seek temporary custody of both children, as they were living together with their mother and Mr. G. The State also filed petitions of wardship for both children, alleging that A.M. was physically abused and that both children were neglected due to an injurious environment. On a temporary basis, the trial court placed the children in DCFS custody on March 3, 2010.

¶ 6                                    I. Procedural Background

¶ 7    The court conducted an adjudicatory hearing beginning in mid-August 2011. A.M.'s parents were each present, but R.G.'s father did not attend. The State produced evidence in the form of the transcript from the earlier hearing, medical records from Comer Hospital and the testimony of Dr. Kelley Staley, the pediatrician who treated A.M. upon his admission to that institution. Dr. Staley testified at some considerable length about the injuries that she diagnosed on the boy's body and also testified about a comprehensive report prepared at Comer, the so-called "MPEEC" report which was admitted into evidence. This report analyzed the medical findings along with historical information provided by Ms. M. during the course of treatment.

¶ 8    Dr. Staley, who was tendered, without objection, as an expert in pediatric abuse, was an assistant professor of pediatrics at Comer. She had completed her residency at Comer in 2006 and was not yet board certified in child abuse and neglect. Staley testified that the team of professionals at Comer worked together to treat the injured children who came under their care and also to make recommendations about each child's welfare.

¶ 9    Dr. Staley actually began treating A.M. while a resident at University of Chicago when the initial neurological injuries from his shaking trauma were recognized in 2005. Then, in January 2008, Dr. Staley was a member of the child protection services team at Comer Hospital and treated A.M. for an arm fracture, which at that time Dr. Staley did not view as suspicious based upon the explanation Ms. M. provided to the hospital. When A.M. was brought to LaRabida for a routine examination in January 2010, the physician at LaRabida, concerned that A.M. needed further evaluation of his injuries, contacted Dr. Staley, who was then an attending physician at Comer. A.M. was ultimately transferred to Comer. Dr. Staley, in her capacity as attending physician, ordered various radiological studies and blood work, while consulting with other specialists. The results of the X-ray studies revealed two tibial fractures, one of which was noticeably older than the other. Ms. M. gave a history for the injury that involved the child's leg getting stuck in the bed, requiring her to yank the leg free, which struck Dr. Staley as a competent cause for the newer leg fracture, as opposed to the other fracture, which was several weeks older and likely caused by a direct blow to the area. In this regard, Ms. M. said that A.M. frequently fell from his bed, but the doctor was concerned that the child had not been taken in for treatment of any such trauma, which should have occurred, because the trauma would have been quite painful.

¶ 10   Dr. Staley also testified about four rib fractures, which were noted to be in various stages of healing, indicating that they had occurred at different times. The doctor found it significant from a potential abuse standpoint that these injuries occurred in multiple occurrences as

opposed from a single incident. While Dr. Staley felt it possible that A.M. could fracture a rib or multiple ribs in a fall from his bed, she doubted that the child's way of bouncing around the home on his buttocks would be a competent cause for a rib fracture. Significantly, Dr. Staley testified that the rib fractures in question were not attributable to "routine household minor accidents," as family members had suggested. In fact, Dr. Staley opined that most nonambulatory children like A.M. suffer such injuries as a result of abuse. In Staley's opinions, these rib fractures were inflicted, not accidental. Dr. Staley later testified that all of these injuries occurred within a three-month period of time and that it was apparent that the child had suffered no such injuries from January 2010 until October 2010, while he was not in his mother's custody.

¶ 11 Some of the blood work revealed an injury to A.M.'s liver, which was expressed in markedly elevated enzymes, which could have been attributable to a medication that A.M. was taking, but Dr. Staley ruled that possibility out as a result of the enzymes decreasing while the child was still taking the medication. Once that cause was ruled out, Dr. Staley opined that the liver injury was caused by blunt force trauma.

¶ 12 Finally, Dr. Staley testified that she was unable to offer an opinion on the cause of two lumbar vertebrae which were found to be fractured.

¶ 13 The State also offered the testimony of Alicia Pickett, a social worker, who testified to various conversations that she had with Ms. M. and Mr. G. about the possible circumstances surrounding the various injuries to A.M.

¶ 14 With this evidence, the State and public guardian rested and Ms. M. called Dr. Christopher Sullivan, another Comer physician, as a witness. Coincidentally enough, Dr. Sullivan had also treated A.M. on three occasions while he was a patient at Comer Children's Hospital. The battle of the experts in this case, therefore, was of physicians from the same institution who had each treated the child. Dr. Sullivan had at least three decades of expertise in pediatric orthopedic surgery, with an emphasis in neurological disorders and fractures. Dr. Sullivan reviewed the entire chart from Comer Hospital, the "MPEEC" report and also drafted his own report. In his report and in his testimony, Dr. Sullivan opined that the elevated liver enzymes were found in the absence of any abdominal fluid, leading him to conclude that the liver was not traumatically injured in the manner suggested by the State. Significantly, Dr. Sullivan was of the opinion that the two tibia fractures were self-inflicted by A.M. in the manner that he bounced up and down as he moved about the home and that the rib fractures could have been caused by falling into furniture or onto a floor. This was confirmed, in his view, by what he observed in a video of A.M. bouncing from a flexed position with his ankles crossed. Dr. Sullivan believed that the rib fractures were likely asymptomatic and also noted that A.M. did not show "normal pain avoidance." He also was of the opinion that the rib fractures could have occurred at the same time. Dr. Sullivan felt that the absence of injuries in the most recent 10 months (while out of his mother's custody) was attributable to his decreased seizure activity. Dr. Sullivan also placed some considerable emphasis on test results that indicated an abnormal bone density in A.M. that could predispose him to fractures.

¶ 15 Ms. M. then called the children's grandmother, Vanda, who testified that she had never

seen Ms. M. abuse or harm A.M. in any way. She also confirmed the rough manner that the child moved himself about and compared it to the bucking of a horse's head, while noting that the movements were fast and aggressive.

¶ 16                                    II. The Trial Court's Ruling

¶ 17    Following closing arguments, the trial court found that A.M. had been physically abused and that both A.M. and R.G. were neglected due to an injurious environment and abused due to a substantial risk of physical injury. The court characterized the case as a "battle of experts" and stated that while Dr. Sullivan was an "excellent orthopaedic surgeon," the court noted that it found him to be "very careless in this case." The trial court found it significant that Dr. Sullivan was unaware of A.M.'s initial elevated enzyme levels, that he failed to properly identify a posterior rib fracture and that he was careless in the actual preparation of his report, and these factors were all troubling to the point that the court was not confident in the doctor's opinions on the matters of legal substance in the hearing. Meanwhile, the court found Dr. Staley's testimony to be "very careful," acknowledging that her extensive experience in child abuse made up for her lack of orthopedic experience.

¶ 18    The trial court found the timing of A.M.'s injuries to be particularly damning for respondents, noting that there was a period of several years following the brain injury in which A.M. suffered only one explained injury, followed by a period of time with numerous unexplained injuries clustered together, followed by a period of 10 months with no injuries while he was placed in foster care.

¶ 19                                    III. The Dispositional Hearing

¶ 20    Following the adjudicatory hearing, the court held a dispositional hearing to determine whether respondents were "unable to parent" and whether the needs of the children would be better served in the custody of DCFS. The State's evidence included a service plan and a family assessment (referred to hereinafter cumulatively as service plan) for Ms. M. and Mr. G. The service plan stated that Ms. M. demonstrated an inability to support or protect the children from risk of harm, while Mr. G.'s lack of capacity to parent posed a continuing threat to the children's well-being. The service plan also detailed Mr. G.'s arrest following his physical assault on Ms. M. in November 2010.

¶ 21    The State next submitted a therapy report from December 2011 for Ms. M. This report related that Ms. M. had been actively attending therapy sessions which largely centered on helping Ms. M. address her thoughts and feelings regarding her domestic violence experience, case involvement, past relationships, and current stressors. The report relayed concerns regarding Ms. M.'s own doubt as to whether she can care for A.M. Ultimately, the report stated that her poor coping skills called into question her ability to care for the two children while working a full-time job. Finally, the State submitted a July 2011 psychological evaluation report. The evaluation stated that "her dependancy and immaturity need to be radically changed for her to become a safety-driven mother and woman," and added that "her defensive style will compromise her ability to live with adequate means to support herself and her children."

¶ 22    Ms. M. tendered four exhibits to the court in support of her ability to regain custody of her children. Three of these exhibits established her successful completion of a parenting class at the Sinai Parenting Institute and the fourth was a certificate of completion of an infant CPR course.

¶ 23    The State then called its first witness, Mattie Franklin, the caseworker for the family since March 2010. Franklin testified that for the previous two years, both A.M. and R.G. had been placed in specialized foster care with R.G.'s grandmother. Franklin related that the home was found to be safe and appropriate and that the grandmother had ensured that A.M. attended his special medical appointments and also kept R.G. up to date with all of her medical needs. Franklin testified that Ms. M. had successfully completed recommended services of DCFS and noted that she had personally supervised some of Ms. M.'s weekly supervised visits with both children, in which she observed that Ms. M. demonstrated appropriate parenting skills.

¶ 24    Franklin testified that Mr. G. moved to Wisconsin in October 2010 and although she did not have a current mailing address for him, she was able to speak with him on the telephone. Franklin stated that although Mr. G. was not currently involved with the recommended services, she would continue to attempt to find service providers for him in Wisconsin. Finally, Franklin testified that based on a conversation with the grandmother/foster parent, Mr. G. was apparently visiting A.M. and R.G. on a weekly basis.

¶ 25    In conclusion, Franklin stated that Ms. M. had made "substantial" progress toward the goal returning her children to her home, with Mr. G. only making "some" progress. Franklin recommended that both children be adjudicated wards of the court with a recommendation that D. Jean Ortega Piron (DCFS) be appointed their legal guardian with a return-home goal of 12 months.

¶ 26    Following Franklin's recommendation, the trial court adjudged both R.G. and A.M. as wards of the court and found both Ms. M. and Mr. G. "unable to parent." A return-home goal for both A.M. and R.G. was set at 12 months, and both children were placed into DCFS guardianship.

¶ 27    Following these proceedings, both Ms. M. and Mr. G. filed timely notices of appeal.

¶ 28                                    ANALYSIS

¶ 29    Respondents contend that the trial court's orders finding them unable to parent were against the manifest weight of the evidence. Based on the briefs that both parties filed, however, it is unclear which specific order they are appealing from. While both parties include "unable to parent," a term specific to the disposition order, the entirety of their arguments relates to issues stemming from the adjudicatory order. This issue is only further muddled by Ms. M.'s notice of appeal, which states she is appealing the adjudicatory order. Therefore, while it is unclear whether the respondents are attempting to appeal from the adjudicatory order finding of abuse and neglect or the disposition order finding them "unable to parent," it is patently clear that neither has provided argument regarding the disposition order. Due to this fact, while neither party has forfeited review of the issue, each has forfeited review of the argument. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (points not argued in

an appellant's opening brief are forfeited).

¶ 30    Despite this confusion in both respondents' briefs, we will assume, based on the content of their arguments, that respondents are actually contending that the trial court erred in its adjudicatory order, which found that A.M. was abused or neglected due to an injurious environment pursuant to section 2-3(1)(b), physically abused pursuant to section 2-3(2)(i) and abused based on a substantial risk of physical injury pursuant to section 2-3(2)(ii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b), 2-3(2)(i), (ii) (West 2010)). The adjudicatory order also found that R.G. was abused or neglected pursuant to section 2-3(1)(b) and 2-3(2)(ii) of the Act (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2010)).

¶ 31    In a petition for adjudication of wardship under the Act, the " 'best interest of the child is the paramount consideration.' " *In re F.S.*, 347 Ill. App. 3d 55, 62 (2004) (quoting *In re K.G.*, 288 Ill. App. 3d 728, 734-35 (1997)). The State must prove its allegation of neglect or abuse by a preponderance of the evidence. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." (Internal quotation marks omitted.) *F.S.*, 347 Ill. App. 3d at 62. Upon review, the trial court's finding "[shall] not be disturbed unless it is against the manifest weight of the evidence." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). "The trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses and, therefore, it is in the best position to determine the credibility and weight of the witnesses' testimony." *Id*. As a result, "the trial court is afforded broad discretion when determining the existence of abuse." *In re R.M.*, 307 Ill. App. 3d 541, 551 (1999).

¶ 32                                    I. Physical Abuse

¶ 33    Respondents contend that the State failed to provide a theory or direct evidence of who was actually responsible for inflicting A.M.'s injuries or an explanation of how A.M. was injured. At the same time, they argue that there was substantial credible expert testimony by Dr. Sullivan which furthered their theory that A.M.'s injuries were self-inflicted. Ms. M., citing *In re Cornica J.*, 351 Ill. App. 3d 557 (2004), also argues that the testimony of one medical expert alone is insufficient for a finding of abuse and neglect.

¶ 34    Section 2-3 of the Act provides:

"(2) Those who are abused include any minor under 18 years of age whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:

(i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function[.]" 705 ILCS 405/2-3(2)(i) (West 2010).

Notably, section 2-3(2)(i) requires that the physical injury occur by "other than accidental" means and does *not* require specific intent to harm the child. (Internal quotation marks omitted.) *In re Marcus H.*, 297 Ill. App. 3d 1089, 1098 (1998).

¶ 35    Notwithstanding respondents' contentions, the focus of an adjudicatory hearing is not whether the respondent abused the minor but rather on whether the minor was abused. *In re J.C.*, 2011 IL App (1st) 111374, ¶ 20. Therefore, who committed the alleged abuse of A.M. is of no particular consequence in an adjudicatory hearing. Second, upon close review of *Cornica*, we find that Ms. M. misrepresents her contention that the testimony of a single medical expert is insufficient evidence to sustain a trial court's finding. Although *Cornica* did reverse the trial court's finding due to an insufficiency of evidence, it did so because the testimony of that witness was insufficient, not that multiple experts would be required for some reason. *In re Cornica J.*, 351 Ill. App. 3d 557 (2004). In fact, the dissent attacked the State's expert's testimony and noted that she only relied on three "objective" test results in rendering her opinion. *Id*. at 573 (Kapala, J., dissenting). The court also found that the remainder of the tests relied upon by the medical expert were "subjective" and routinely criticized for being " 'open to interpretation.' " *Id*. at 568 (majority op.). Finally, the court stated that out of the three objective tests that were used, one of the three, an IQ test, has routinely been dismissed as insufficient on its own to deem a parent unable to "discharge parental responsibilities." *Id*. at 569. For these reasons, we are unpersuaded by respondents' arguments based upon that case.

¶ 36    Respondents' remaining argument on this issue is their contention that the trial court relied too heavily on Dr. Staley's testimony while discrediting Dr. Sullivan's due to a few "typos" in his report. While acknowledging that Dr. Staley is a board-certified physician in child abuse, respondents argue that her testimony was given too much credit since she was a recent medical school graduate who had a mere five years' experience when she examined A.M. in 2010. Remarkably enough, even though Dr. Staley was involved in this child's treatment on three separate admissions, the respondents suggest that she had minimal involvement with him, and even suggested in closing argument to the court that the entire duration of her personal treatment of A.M. was all of 20 minutes. At the same time, respondents highlight the undeniably impressive credentials of their medical expert, Dr. Sullivan, a doctor for nearly 32 years with extensive experience with pediatric orthopedic surgery with a special emphasis on neurological disorders such as cerebral palsy, and argue that his "confident and well-reasoned testimony" was improperly discredited, due merely to a few typographical errors in a report that Dr. Sullivan was given only 24 hours to write. Respondents did not detail the amount of time that Dr. Sullivan actually spent with A.M. in the hospital but place particular emphasis on the fact that he visited with the child and observed a video of his ambulatory technique in the course of acting as a consultant for this hearing.

¶ 37    To briefly reiterate, Dr. Sullivan testified that A.M.'s neurological limitations, his ambulatory state and lack of self-avoidance of injuries caused him to have a propensity to thrash about on the floor and bounce into furniture throughout the home. These movements forced A.M. to wear a helmet for his own protection. Dr. Sullivan opined that not only were these neurological disorders the most likely cause of all of A.M.'s injuries, but they also made it difficult for him to express that he was injured, which, in respondents' view, explained why they could not specifically identify how and when A.M. was injured.

¶ 38    Despite these contentions, we find that the State's evidence supported the trial court's

finding that the injuries to A.M. were nonaccidental. First, the State provided the testimony of Dr. Staley, in which she detailed A.M.'s injuries and her expert opinion on their causation, while also opining that the injuries were not self-inflicted. In sum, she stated that A.M.'s multiple rib injuries and raised liver enzymes were due to physical abuse, not a result of daily household activity. Dr. Staley's testimony was also supported by the "MPEEC" report, which concluded that the rib fractures and liver injury were due to some type of excessive force trauma.

¶ 39 Finally, despite respondents' urging, it is well settled that the trier of fact is in the best position to weigh the credibility of experts, leaving us reluctant to second-guess the findings of the trial court in a " 'battle of experts.' " See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 216 (2005) (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.); *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 11 (2001). Therefore, we find the trial court's decision to be reasonable and based on the evidence presented at trial. Simply put, the trial court's finding of neglect was not against the manifest weight of the evidence presented at trial.

¶ 40                        II. Abuse Due to Substantial Risk of Physical Injury

¶ 41 Respondents next contend that the trial court's finding that A.M. was abused due to a substantial risk of physical injury (section 2-3(2)(ii) of the Act) was against the manifest weight of the evidence. This section states:

> "(2)Those who are abused include any minor under 18 years of age whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:
>
>      ***
>
>      (ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or lose or impairment of any bodily function[.]" 705 ILCS 405/2-3(2)(ii) (West 2010).

¶ 42 The same evidence that supports the physical abuse finding also supports the trial court's finding that the State proved by a preponderance of the evidence that A.M. was abused due to a substantial risk of physical injury. See *In re F.S.*, 347 Ill. App. 3d 55, 66 (2004). Accordingly, the trial court's finding pursuant in this specific was not against the manifest weight of the evidence.

¶ 43                        III. Neglected Due to an Injurious Environment

¶ 44 Respondents next contend that the trial court's finding that A.M. was neglected due to an injurious environment (section 2-3(1)(b) of the Act) was against the manifest weight of the evidence. Section 2-3(1)(b) of the Act states that those who are neglected include "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2010).

¶ 45    " 'Neglect' is generally viewed as a failure to exercise the regard that circumstances justly demand and encompass willful as well as unintentional disregard of parental duties." *In re S.D.*, 220 Ill. App. 3d 498, 502 (1991). "An injurious environment is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *In re D.W.*, 386 Ill. App. 3d 124, 135 (2008).

¶ 46    The same evidence that supports the physical abuse finding and the finding of abuse due to a substantial risk of physical injury supports the finding that the State proved, by a preponderance of the evidence, that A.M. was neglected due to an injurious environment. See *In re F.S.*, 347 Ill. App. 3d at 67. As detailed above, the injuries to A.M. were "nonaccidental" and occurred on multiple occasions. Accordingly, the trial court's finding pursuant to section 2-3(1)(b) of the Act was not against the manifest weight of the evidence.

¶ 47                    IV. Findings Regarding R.G.

¶ 48    Finally, the trial court found that R.G. was neglected due to an injurious environment (section 2-3(1)(b)) and abused due to substantial risk of physical injury (section 2-3(2)(ii)).

¶ 49    It is well settled that the State may use the evidence of neglect and abuse of one child as evidence of abuse and neglect of another child who lives in the same household and for whom the same parent is also responsible. See *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008) (citing *In re T.B.*, 215 Ill. App. 3d 1059, 1062-63 (1991) ("Where an injurious environment has been found to exist, the trial court need not wait until the child becomes a victim or is emotionally damaged permanently in order to remove the child from the household.")); *In re R.R.*, 409 Ill. App. 3d 1041, 1045 (2011) ("Proof of neglect of one minor is admissible evidence on the issue of neglect to any other minor for whom the parent is responsible.").

¶ 50    Furthermore, section 2-18(3) of the Act addresses this exact situation, stating, "[I]n any hearing under this act, proof of abuse [or] neglect *** of one minor shall be admissible evidence on the issue of the abuse [or] neglect *** of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2010).

¶ 51    Thus, the evidence supporting the neglect and abuse finding for A.M. supports the abuse and neglect finding for R.G., who lived in the same home and for whom Mr. G. and Ms. M. were responsible. Therefore, as stated above, the trial court's findings pursuant to sections 2-3(1)(b) and 2-3(2)(ii) were not against the manifest weight of the evidence.

¶ 52    We therefore affirm the rulings of the trial court in all respects.

¶ 53    Affirmed.