2023 IL App (1st) 230842-U
No. 1-23-0842

FIRST DIVISION
November 20, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| IN THE INTEREST OF: | ) | Appeal from the Circuit Court |
| J.B., | ) | of Cook County, Illinois |
| | ) | Juvenile Justice and |
| Minor-Respondent-Appellee | ) | Child Protection Department, |
| | ) | Child Protection Division |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 22JA384 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| L.S., | ) | Levander Smith, Jr. |
| | ) | Judge Presiding. |
| Father-Respondent-Appellant.) | ) | |

---

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's adjudication order finding that Respondent's minor child was neglected due to an injurious environment and abused due to substantial risk of injury, as well as the subsequent dispositional order finding that Respondent was currently unable to parent the minor.

¶ 2    Respondent L.S. appeals from the circuit court's adjudication order finding his child, J.B.,

neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act of

1987 ("Act") (705 ILCS 405/2-3(1)(b) (West 2022)), and abused due to being at risk of physical injury pursuant to section 2-3(2)(ii) of the Act. Respondent further appeals from the subsequent disposition order making J.B. a ward of the court. For the following reasons, we affirm the circuit court's orders.

¶ 3                                BACKGROUND

¶ 4      Minor-Respondent-Appellee J.B. is a boy born on May 18, 2022. J.B.'s mother, D.B., was defaulted for want of appearance and is not a party to this appeal. His father is L.S., the respondent-appellant. On May 25, 2022, the State filed a petition for adjudication of wardship and motion for temporary custody, alleging that J.B. was neglected due to an injurious environment and abused due to a substantial risk of injury. In its petition, the State alleged the following as the basis for both of its allegations:

> Mother has untreated mental health issues. Mother has previously been diagnosed with bipolar schizoaffective disorder. Per medical personnel mother was exhibiting signs of psychosis at the time of the minor's birth and was psychiatrically hospitalized. Mother minimizes her mental health issues and refuses to take her psychotropic medication. Putative father states that he was aware of mother's untreated mental health issues. Parents reside together and paternity has not been established.

The following day, the circuit court held an evidentiary temporary custody hearing, at which it found probable cause that J.B. had been abused and neglected, and he was placed in the temporary care of the Department of Children and Family Services ("DCFS.") The Public Guardian was appointed as attorney and guardian *ad litem* ("GAL") for J.B., and the Public Defender's Conflict Unit was appointed to represent L.S. The court also ordered a DNA test to verify L.S.'s paternity of J.B. On August 16, 2022, the court entered an order finding L.S. to be the minor's father.

¶ 5                          The Adjudication Hearing

¶ 6      The adjudication hearing commenced on January 19, 2023, and concluded on the continued date of May 8, 2023. The evidence presented consisted of D.B.'s medical records, including her

psychiatric hospitalization at the time of J.B.'s birth as well as her prior hospitalizations. The court also heard live witness testimony from DCFS Investigator Halema Townsend.

¶ 7    D.B.'s medical records showed over thirty previous hospitalizations, including several mental-health-related involuntary admissions, and diagnoses including schizophrenia and bipolar disorder with psychosis. In a series of hospitalizations occurring in 2021, the records describe her as irritable, paranoid, religiously preoccupied, disorganized, tangential, rapid in pressured speech, angry to calm in demeanor, easily distracted, and having poor insight and judgment into her own mental health issues. She was also admitted to the hospital for psychiatric care immediately after giving birth to J.B., due to a hypomanic episode triggered during labor. The records from that admission indicate that she appeared bizarre, suicidal, disorganized in her thought process, and noncompliant with her psychotropic medication.

¶ 8    DCFS Investigator Townsend was assigned to investigate J.B.'s case following D.B.'s psychiatric admission after giving birth. Townsend testified to her conversation with D.B. on May 19, 2022, stating that she seemed delusional, was unable to give full answers to questions, and would randomly blurt out inappropriate statements. She also told Townsend that Townsend could "plan [D.B.'s] funeral." D.B. was also aware of her mental illness diagnoses, but stated that she did not take her prescribed medication and did not plan on taking it. Townsend acknowledged that she had not visited D.B. and L.S.'s shared residence, but she testified to a phone conversation she had with L.S. He told her that he was aware of D.B.'s multiple mental health diagnoses, that he and D.B. resided together, and that he could not ensure that D.B. would be compliant with taking her medication. He also indicated that he did not have any concerns regarding D.B.'s ability to care for J.B. while she was not taking her psychotropic medication. Townsend testified that L.S. conveyed to her his desire to have custody of J.B.

¶ 9       Following the presentation of evidence and arguments from both sides, the circuit court issued its adjudicatory ruling, finding that the State had met its burden of proof as to both the neglect and abuse claims. The court stated in its ruling:

> [T]he best evidence was from the father himself and that was the statement *** that [Townsend] *** gave with respect to her conversation with the father where he confirmed that the mother had multiple, as the state pointed out, mental illnesses and that they did reside together, but he still had no concerns about the mother's ability to parent even though, and I am putting in the even though, he could not assure that the mother would be compliant with her medications. Okay. This is why also I'm finding that these findings were inflicted not just by the mother but also by the father. This parenting *** requires at least two people that put the minor on the earth, and in this case the parents were said by the father to reside together, but there were no assurances that were provided from the father or the mother that the mother would not be involved in the parenting, you know, and the GAL gave some practical examples, you know, I have to run to the store, look after the child while I'm gone or what have you. Well, the case law is clear the Court does not have to wait for anything to happen to the child before the Court finds that anticipatory neglect is at play as it is here. The *** number of mother's hospitalizations alone is concerning especially in the time frame provided. But her willing admission, I mean just her voluntary admission that she is not compliant with the medications was also very concerning, her prescription medications for her mental health diagnoses which included bipolar disorder and psychosis.

The circuit court then entered an order finding that J.B. was neglected due to an injurious environment and abused due to a substantial risk of injury. The order indicated that both parents were found to be perpetrators of the neglect and abuse.

¶ 10      The court further stated that both parents would have nine months from the adjudication date to show the court that they had made reasonable efforts and progress towards the return of J.B. to their care. Failure to do so, according to the court, would result in the possibility of having their respective parental rights terminated. The court identified three ways in which the parents were required to make that demonstration of reasonable efforts and progress, as follows: (1) by cooperating with DCFS; (2) by complying with the terms of the Service Plan that they needed to complete, as determined and provided by DCFS, "as quickly and successfully as possible;" and (3) by correcting the conditions that led to J.B.'s being placed in the care of DCFS.

¶ 11    The circuit court then immediately commenced the dispositional hearing.

¶ 12                                    The Dispositional Hearing

¶ 13    During this portion of the May 8, 2023 hearing, the State admitted additional documentary exhibits into evidence, including: an Integrated Assessment from September 2022; a DCFS Service Plan from May 5, 2023; a parenting class report and certificate of completion for L.S., dated December 18, 2022; a January 13, 2023 substance abuse assessment for L.S.; and two therapy reports for L.S., from December 15, 2022 and March 15, 2023.

¶ 14    The court also heard testimony from DCFS Caseworker Jophia George, who had been assigned to J.B.'s case. George testified that she had visited J.B. in the foster home in which he had been placed since his birth. She stated that she had no communication with D.B. at present, and that D.B. was not engaged in services apart from a single visit with J.B. in December 2022. L.S. came with her, and George testified to her observations of the parents during this visit. She said that D.B. was not engaging with J.B., did not pick him up, and only held him when L.S. handed him to her. At the end of the visit, George spoke with D.B. about services and asked her about her intentions regarding getting J.B. back. D.B. reportedly did not indicate yes or no, and the only response she gave to George was "okay."

¶ 15    As to L.S., George testified that he was engaging with his son, picking him up, changing his diapers, and meaningfully interacting with him. She also stated that L.S. had completed parenting classes, which was one of the requirements of the DCFS Service Plan. The plan also included a recommendation that L.S. undergo parent coaching, but George stated that L.S. had been put on a waitlist for a coaching program and that she put in a referral for him at another location only on the day of the hearing, and he had therefore not yet completed coaching. The court determined from George's testimony that this referral would also satisfy the separately-listed

Service Plan requirement of completing a nurturing parenting program, which also had not yet occurred.

¶ 16    Next, she testified to the contents of the therapy reports in evidence, stating that L.S. was enrolled in an individual therapy program, where he was working on his coping skills and on the reasons for which this matter came into DCFS's system. At the time of the hearing, L.S. did not yet have a discharge date from the therapy program. George also testified regarding the substance abuse assessment for L.S; the conclusion of the assessment was that he did not need drug treatment, but it did recommend that he undergo a psychiatric evaluation. As of the hearing date, the evaluation had not yet taken place.

¶ 17    The circuit court also asked George about the random urine testing recommended in DCFS's plan, but George confirmed that she had not referred him for drug testing in light of the results of the substance abuse assessment. However, the circuit court noted L.S.'s "history of dangerous drug charges," as per the Integrated Assessment that recommended L.S. for the substance abuse evaluation. The Integrated Assessment noted that a prior LEADS check showed L.S. had two charges and one conviction for dangerous drugs. While the court acknowledged that drug use was not a basis for the custody case, it ruled that, because of L.S.'s criminal record, he should undergo one or two random urine drops.

¶ 18    The court then inquired about L.S.'s supervised visits with his son. George testified that L.S.'s visits were scheduled for two hours once per week, and that she personally supervised once per month. Based on her observations, L.S. was very bonded with J.B., always holding him, and making sure to feed him and change his diapers before J.B. returned to his foster home. George also stated that there was a plan in place to request unsupervised visits of J.B. at L.S.'s home, once DCFS had conducted a check on his home to verify its safety and suitability. George noted that

L.S.'s sixteen-year-old son lived with him and that D.B. and L.S. no longer lived together. L.S. reported that he no longer had an ongoing relationship with D.B. L.S. also told DCS that he was fully employed and had a plan in place for daycare for J.B.

¶ 19    At the conclusion of George's testimony, the circuit court asked why the State was recommending that J.B. become a ward of the court and placed in guardianship. The State responded that L.S. was unable to care for, protect, train, or discipline J.B. at the time. While the State acknowledged that L.S. had completed many of DCFS's recommended services, he still needed to complete some additional programs, including: the drug treatment assessment recommended in light of his prior drug convictions; the nurturing parenting program due to the minor's very young age; the psychiatric evaluation based on the report from L.S.'s substance abuse assessment, which noted that he might need anxiety medication; and the remainder of his individual therapy. Despite L.S.'s demonstrated efforts and progress, there was a concern that there was no documentation or testimony about whether he had sufficiently addressed the factors that brought this case into the system. The State further added that there was no information about whether L.S. had raised the sixteen-year-old currently living with him, or for how long he'd been living with L.S.

¶ 20    The circuit court issued its ruling, finding that L.S. was currently unable to parent J.B. and that D.S. was unable and unwilling to parent him. The minor was then placed in the guardianship of DCFS. The court then provided a detailed explanation of its ruling, beginning with an acknowledgement of the efforts L.S. had made towards completing the steps of the DCFS Service Plan, but adding that there were still services that he was either in the process of completing, or had not yet started. As stated by the court, "The father has made some progress, and the only reason that the Court is not finding it to be substantial is because there are more services that [DCFS] will

have him become engaged in." Therefore, the court could not make a finding of fitness at that time. Instead, the court laid out a list of steps that needed to be taken by L.S. and DCFS, with "the goal of return [*sic*] home within twelve months, recognizing that it does not have to take twelve months for all of the services to \*\*\* [be] completed." The court added that this process could take far less time, and added that it reviews such cases approximately every six months.

¶ 21    In explaining its ruling, the court stated that while it also recognized the efforts L.S. had made, it was particularly concerned about the substance abuse assessment. The assessment was based on L.S.'s self-reporting and, where the assessment asked if there were any emotional conditions and complications that will impact the client's treatment, he stated yes, that he "has poor decision-making that has been disappointing himself because he all he wants is his children back with him and living a good life together." He also reported that "he needs to think about the people he surrounds himself with for situations to end up like this," and he expressed a desire for treatment. The court noted that it was based on this assessment that L.S. was recommended for a psychiatric evaluation.

¶ 22    The circuit court instructed George to provide the substance abuse report to L.S.'s therapist along with a copy of the Integrated Assessment and all court orders. The court stated that the therapist needed to weigh in on the psychiatric evaluation after reviewing all of L.S.'s documentation and addressing with him the reasons why this case came into the system, as well as any other concerns the therapist may have. The court also ordered random drug drops and for an updated LEADS criminal history on L.S., a background check on the sixteen-year-old son living with him, and a Child Endangerment Risk Assessment Protocol (CERAP) investigation of L.S.'s home.

¶ 23    The court further noted that while L.S.'s visits with J.B. had been "outstanding," they were too constrained and limited for the court to be able to make a finding that he was able to parent J.B. The court ordered that L.S. have more time with his son, as facilitated by DCFS. The court concluded its findings by stating that while reasonable efforts had been made, the services that would make family reunification appropriate as to L.S. had been unsuccessful to date, because he had not yet completed all of the required services.

¶ 24                                    Issues on Appeal

¶ 25    L.S. now appeals from the adjudication and disposition orders of May 8, 2023. He argues on appeal that the court improperly took the evidence of D.B.'s mental health as *prima facie* proof of neglect, the existence of an injurious environment, and a substantial risk of harm to the minor. He contends that while the State established that D.B. had a history of mental illness, it failed to prove the existence of a nexus between the mother's mental illness and a risk of harm to the child, or that the mental illness rendered her unable to carry out her parental responsibilities.

¶ 26    In support of this argument, he states that when D.B. was discharged from psychiatric care five days after giving birth to J.B., she was reported to be alert and oriented, with no symptoms of mania present. Medical staff determined that she was not a danger to herself or others. L.S. further states that the medical records from this time show that she was compliant with her medications. L.S. alleges that the circuit court hinged its findings on L.S.'s statements that he lived with D.B. at the time of their son's birth and that he did not consider her mental illness to be a concern in her ability to parent J.B.

¶ 27    His second argument is that the circuit court's dispositional hearing findings that he was unable to care for J.B. were against the manifest weight of the evidence and failed to properly weigh the interests of a parent's right to the care and custody of his child. In support, he claims

that he established at the dispositional hearing that he was no longer living with D.B.; furthermore, he had ended his relationship and contact with her and intended to do so as long as she was not consistently taking her prescribed psychotropic medication. He also points to the testimony and documentation showing that he had completed or was actively working towards completing the required services identified by DCFS, and claims that the court should not have used the psychiatric evaluation recommendation as a basis for finding L.S. unfit to parent because by indicating that his therapist would need to review any such evaluation, the court conveyed concern that the substance abuse evaluator was not fit to recommend the evaluation in the first place.

¶ 28    L.S. also pushes back against the circuit court's concern about his self-reported feelings of anxiety, stating that his therapy program was designed to help him cope with this issue while learning parenting skills, and his therapist noted that no psychiatric assessment or medication assessment was recommended at the time of her March 2023 report. Finally, in addressing the court's concern that he had not completed the nurturing parent program, L.S. provides a lengthy description of the parenting class that he successfully completed, including notes of his consistent, active, and engaged participation and performance. He adds in support of this the positive testimony from George about her observations of L.S. and J.B. during visits.

¶ 29    The parenting course also included an observation report of L.S. interacting with J.B., which indicates his satisfactory performance. L.S. further argues that while his parenting class report does state that he and J.B. might benefit from a nurturing parent program, it recommends that he be referred to this program after J.B. reaches one year of age, because the skills addressed by such a program were better suited for a child of at least that age. L.S. concludes with stating that if the circuit court believed that completion of the nurturing parent program was necessary for

L.S. to be able to regain his parental rights, it should have found him fit to parent and reunited him with J.B. under a protective order that required him to complete the program.

¶ 30                                    ANALYSIS

¶ 31                    Proceedings Under the Juvenile Court Act

¶ 32    In proceedings under the Juvenile Court Act ("Act,") the paramount consideration is the best interests of the child. *In re Z.L.*, 2021 IL 126931, ¶ 58 (citing *In re A.P.*, 2012 IL 113875, ¶ 18). "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004).

¶ 33    Under the Act, the trial court employs a "two-step process" in determining whether a minor should be removed from parental custody and made a ward of the court. *In re Z.L.*, 2021 IL 126931 at ¶ 58. The first step is the adjudicatory hearing, at which "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2022). "The only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful." *In re Arthur H.*, 212 Ill. 2d at 467. At the adjudicatory hearing, it is the State's "burden to prove allegations of abuse or neglect by a preponderance of the evidence." *In re Z.L.*, 2021 IL 126931 at ¶ 61; *see also In re Arthur H.*, 212 Ill. 2d at 464. To meet the preponderance of the evidence standard, the State must establish the allegations are more probably true than not. *In re Z.L.*, 2021 IL 126931 at ¶ 61.

¶ 34    "If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then moves to step two, which is the dispositional hearing." *Id.* at ¶ 60. At the dispositional hearing, the court determines "whether it is consistent with the health, safety, and

best interest of the minor and the public that the minor be made a ward of the court." *Id.* (citing 705 ILCS 405/2-21(2) (West 2018)).

¶ 35  We will not disturb the trial court's finding of abuse or neglect unless the decision is against the manifest weight of the evidence. *Id* (citing *In re A.P.*, 2012 IL 113875 at ¶ 17). A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." *Id.* If the State fails to prove its abuse or neglect allegations by a preponderance of the evidence, "the trial court must dismiss the petition." *Id.* Because the trial court has the opportunity to observe the conduct and demeanor of the parties and witnesses, it is in the best position to determine the credibility and weight of the testimony before it. *In re R.G.*, 2012 IL App (1st) 120193, ¶ 31. Therefore, we afford the trial court broad discretion when determining the existence of abuse. *Id.* (quoting *In re R.M.*, 307 Ill.App.3d 541, 551 (1st Dist. 1999)). Additionally, because child custody cases are delicate, difficult matters, the trial court is vested with discretion to an even greater degree than in other appeals to which the manifest weight standard applies. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 50 (quoting *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1st Dist. 1998)).

¶ 36  Similarly, the trial court's finding of parental unfitness is reviewed under the manifest weight of the evidence standard. *Id.* If the court makes a finding of unfitness, "it then must decide whether it is in the best interest of the child to terminate parental rights." *Id.* (citing 705 ILCS 405/2-29(2) (West 2016)).

¶ 37  In the present appeal, L.S.'s arguments are directed to the findings of neglect and abuse at the adjudication hearing, as well as the circuit court's determination at the dispositional hearing that he was currently unable to parent J.B.

¶ 38                    The Parties on Appeal

¶ 39    Before we address the argument on appeal, we note that while D.B. is not a party to this appeal, the court made several findings relating to D.B., her mental health history, her interactions with DCFS, etc. On appeal, L.S. challenges many of these findings as well. The contents of the record pertaining to D.B. are relevant on appeal because the circuit court applied them to its findings at both stages of the May 8, 2023 hearing with regards to L.S. L.S. was—separate from D.B.—also found to have been a cause of abuse and neglect to J.B., and was further found to be unable to parent J.B. at that time. In addressing L.S.'s arguments on appeal, we will not review the court's determinations as to whether D.B. caused J.B. to be abused and neglected, or that she was unable and unwilling to parent him, as these issues are not before us on appeal. However, we will discuss the evidence presented and findings made as to D.B. where they are relevant to the court's determinations regarding the respondent-appellant.

¶ 40                    The Court's Findings of Neglect and Abuse

¶ 41    Section 2-3(1) of the Act defines the circumstances under which a minor can be found "neglected," while section 2-3(2) defines when a minor can be found "abused." 705 ILCS 405/2-3 (West 2022). Here, the trial court found the minor to be neglected pursuant to section 2-3(1)(b) of the Act ("environment is injurious to the minor's welfare,") and abused pursuant to section 2-3(2)(ii) of the Act ("substantial risk of physical injury.) Id. Cases involving allegations of abuse and neglect are fact-specific and must be decided based on the unique circumstances of the individual case. *In re Arthur H.*, 212 Ill. 2d at 468.

¶ 42    "Neglect" is defined as "the failure to exercise the level of care that is demanded by the circumstances." *In re L.S.*, 2022 IL App (1st) 210824, ¶ 127. It is a fluid term that encompasses willful as well as unintentional conduct, and "its meaning varies as the context of the surrounding circumstances changes." *In re Arthur H.*, 212 Ill.2d at 463 (quoting *In re N.B.*, 191 Ill.2d 338, 346

(2000)). The concept of an "injurious environment" also varies depending on the facts, but it has generally been defined as "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." *Id.*

¶ 43    The doctrine of "anticipatory neglect" is premised on the concept that "the circuit court should not be forced to refrain from taking action until each particular child suffers an injury." *Id.* at 477. The court can make a finding of neglect not only in instances where the minor is already being neglected or abused, but also those who may become neglected or abused. *In re Jordyn L*, 2016 IL App (1st) 150956, ¶ 34. The theory of anticipatory neglect "'flows from the concept of an 'injurious environment'' and, likewise, there is no *per se* rule that neglect or abuse of one child conclusively establishes, or does not establish, the neglect of another child—it amounts only to admissible evidence." *Id.* (quoting *In re Arthur H.*, 212 Ill.2d at 468-69.) While evidence of neglect or abuse to a sibling living with the same parent or guardian may be relevant to making a finding of anticipatory neglect, it is "incredibly less important than what is occurring with, and to, the specific minor in question, who is to be the central focus." *Id.* at ¶ 35.

¶ 44    A finding of abuse due to substantial risk of injury is appropriate where the minor's parent or other person responsible for his welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." *In re R.G.*, 2012 IL App (1st) 120193 at ¶ 41 (quoting 705 ILCS 405/2–3(2)(ii) (West 2010)).

¶ 45    In the present matter, L.S.'s argument against the circuit court's findings of neglect due to injurious environment and abuse due to substantial risk of injury at the adjudication stage is that the court improperly based its findings on the basis of D.B.'s mental health issues. The State does not dispute L.S.'s contention that merely establishing a parent's mental illness is not enough to

sustain a finding of abuse or neglect, and that the State must show that the mental illness "places the children in an injurious environment." *See In re Faith B.*, 216 Ill.2d 1, 14 (2005). We agree; certainly, mental illness does not inherently make someone a danger to their child or renders them unable to parent. However, L.S.'s argument misconstrues both the State's case and the circuit court's findings.

¶ 46    In explaining its findings, the circuit court was clear that the issue was not that D.B. had a diagnosis of bipolar disorder with psychosis. Instead, the court was concerned that she had a demonstrated history of noncompliance with her medication, and willingly admitted that she did not plan to change this. Additionally, the court heard the testimony of Townsend and George, who interacted with D.B. after her psychiatric hospitalization following J.B.'s birth and during a supervised visitation with J.B., respectively. Both DCFS workers raised concerns regarding her ability and willingness to parent, including concerns that were directly related to her mental illness.

¶ 47    Even if she was able to be released from psychiatric hospitalization in alert and oriented condition, without presenting a danger to herself or others, and compliant with her medication while she was under medical observation, as L.S. argues, this does not negate the concerns about her ability to remain in such a state outside of the hospital. Indeed, Townsend stated that D.B. expressed several concerning behaviors, including suicidal thoughts, delusions, a lack of insight into her own mental health issues, and an intent to stop regularly taking her medication. The court additionally reviewed records of D.B.'s medical history, which indicated that the behavior she displayed upon discharge was unlikely to be a permanent change.

¶ 48    From his statements and from the fact that he had previously resided with her, L.S. was aware that she had a history of mental illness and that she was noncompliant with her medication. Furthermore, he admitted that he was unable to make sure that she takes her medication. However,

he also expressed that he did not see this as a concern to having J.B. live with them, in their care. The court found that his awareness of her condition, coupled with his failure to appreciate the potential harm to J.B. and the complications to his own ability to parent the minor, created an unsafe environment and risk of injury for J.B.

¶ 49 Reviewing the circuit court's treatment of D.B.'s mental health history, we cannot conclude that the court based its findings of abuse and neglect at the adjudication hearing on the mere fact that the minor's mother was mentally ill. We note again that the court's determinations as to whether D.B. could have custody of J.B. are not before us on appeal. However, the court's findings are relevant because the court was concerned about how L.S. responded to the ways in which D.B.'s mental health would impact J.B. and the environment in which he would be living. The court specified that its abuse and neglect findings were directed at both parents, stating it was "finding that these findings were inflicted not just by the mother but also by the father." The court also raised the idea of anticipatory neglect in explaining that it did not need to wait for anything to happen to J.B. in order to make its findings that the situation posed by both D.B.'s unmanaged mental health condition and concerning behavior, and by L.S.'s response, created an injurious environment and a substantial risk of injury to J.B.

¶ 50 Based on the evidence presented to the circuit court at the adjudication hearing, we find that the State met its burden of showing that it was more likely true than not that D.B. and L.S. would not ensure that J.B. would be in a safe and nurturing environment. Similarly, we find that the State met its burden of showing that D.B. and J.S. created a substantial risk of physical injury to J.B., stemming from the same concerns regarding D.B.'s health and behavior and L.S.'s response. Affording the circuit court the deference appropriate for its review of the evidence in a child custody matter, we find that the court did not rule against the manifest weight of the evidence.

¶ 51        The Court's Finding That L.S. Was Currently Unable to Parent J.B.

¶ 52    The purpose of a dispositional hearing held pursuant to section 2-22 of the Act is not to terminate parental rights, but for the circuit court to determine what further actions would serve the best interests of the minor. *In re April C.*, 326 Ill.App.3d 225, 237 (1st Dist. 2001); *see also In re Faith S.*, 2019 IL App (1st) 182290, ¶ 76. The dispositional hearing and the court's subsequent ruling on whether to make the minor a ward of the court provide the parents with "'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *In re April C.*, 326 Ill.App.3d at 237 (quoting *In re G.F.H.*, 315 Ill.App.3d 711, 715 (2d Dist. 2000).

¶ 53    If the court determines that the parents or guardians of a minor who has been adjudicated a ward of the court are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of the minor's parents, guardian or custodian," the court may place the minor in the guardianship of DCFS. 705 ILSC 405/2-27(1) (West 2022). The overriding concern of the circuit court in determining the appropriate disposition for the minor ward is the minor's best interest. *In re Daniel G.*, 2021 IL App (1st) 210640, ¶ 52. We will only reverse the circuit court's dispositional order if its findings of fact are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *Id.* at ¶ 54.

¶ 54    In the present matter, L.S. argues that the circuit court erred in finding that he was unfit to parent because it failed to properly weigh his parental rights to the case and custody of his child. He further contends that the court's finding of unfitness was against the manifest weight of the evidence, particularly the progress he had made and continued to make in completing the DCFS

Service Plan requirements, his performance during supervised visitation of J.B., and the fact that he no longer lived with or had a relationship with D.B. Conversely, he argues that the court placed too great an emphasis on the recommendations for a psychiatric evaluation and for his completion of a nurturing parent program, and on his self-reported feelings of anxiety. He also states that if the court still required him to complete the nurturing parenting program, it should have found him fit to parent and reunited him with J.B. under a protective order that required him to complete the program.

¶ 55    Much of what we stated regarding the court's treatment of the evidence and testimony of D.B.'s mental health history, specifically as it impacted the court's determination of L.S.'s judgment and ability to care for J.B., applies here as well. While the court was aware that L.S. claimed to no longer live with D.B. and to no longer have any relationship with her, it was concerned that, despite being familiar with her mental health issues, he did not seem to appreciate the problem this posed to her—and his own—ability to provide a safe, stable environment for an infant child. L.S.'s argument, both before the circuit court and on appeal, that he no longer has contact with D.B. and she no longer lives in the home where L.S. intends to parent J.B., only further indicates his awareness that her mental health issues pose a valid problem for the minor's care and safety.

¶ 56    George's statements at the dispositional hearing support the court's concerns—she observed D.B. at the single parenting visit that D.B. attended, and reported that D.B. was not engaging with her son, and did not express any interest in having J.B. returned to her care. Even if his distancing himself from her could be taken as a sign of improvement in his judgment, the circuit court was not convinced at the time of the hearing that L.S. had made sufficient progress to overcome the concerns raised by his until-recent response to D.B.'s situation.

¶ 57 It is important to note that the circuit court did not rule that L.S.'s parental rights to J.B. were irrevocably terminated—indeed, the court made it clear that it foresaw him being able to be reunited with his son within a year, if not sooner. The court clearly laid out a number of items that needed to occur in order to sufficiently demonstrate to the court that it was in J.B.'s best interests to be placed in his father's care. These steps all stemmed from either the DCFS Service Plan, or related followup from the court's review of the evidence.

¶ 58 At the time of the hearing, L.S. was in therapy but had not been discharged, was waiting to be placed in a nurturing parenting program, and had only been able to demonstrate his ability to care for J.B. under very limited, supervised conditions. DCFS had not conducted a check of his home, and there was no information regarding whether L.S.'s teenage son posed any concerns for J.B.'s safety. Additionally, the court considered the substance abuse evaluation's recommendation that J.B. be given a psychiatric evaluation based on his own self-reported mental health concerns, and also ordered random drug drops and an updated check of L.S.'s criminal history after being presented with evidence of his past charges and conviction for possession of dangerous drugs. L.S. presents us with no authority stating that the court's disposition, based on these facts, was against the manifest weight of the evidence.

¶ 59 We find that the court had sufficient basis for determining that L.S. was currently unfit to parent, but that there was an identifiable path in place for him to be able to demonstrate in the near future that it would serve the best interests of the minor to place him with his father.

¶ 60 In concluding, we note that we are far from dismissive of the documented progress that L.S. has made in participating in supervised visits with his son, in his compliance with attending therapy, and in his active engagement in the parenting class. However, after reviewing the hearing transcript, we cannot say that the circuit court failed to adequately consider this evidence either.

In fact, the court commended his efforts throughout the hearing, and emphasized that while it could not, at that time, find that L.S. was a fit parent and that it was in J.B.'s best interest to be placed under his care, L.S. was well on his way towards being reunited with his son. We recognize L.S.'s significant efforts to become a good parent to his child, and we are encouraged by the circuit court's optimism in L.S.'s ability to complete all of the remaining requirements it identified in its ruling.

¶ 61     That said, we do not find that the court erred in weighing this against the other evidence, among which were the recommendation for a psychiatric evaluation, the answers L.S. gave regarding his mental state, the fact that DCFS required him to complete a nurturing parent program, and the limited nature of his interactions with J.B. Giving the circuit court the deference afforded to it in making its ruling following a dispositional hearing, we find that its decision was not against the manifest weight of the evidence. To address L.S.'s final argument that the court could have made a different dispositional ruling, we add that we are not tasked with deciding whether there was a more optimal possible ruling, but whether the court's decision was so erroneous that the opposite conclusion was clearly evident. We do not find this to be the case here. We find that the circuit court's ruling that L.S. was not yet fit to parent J.B., and to place J.B. in the guardianship of DCFS while L.S. worked to complete the steps identified by the court was not against the manifest weight of the evidence.

¶ 62                                      CONCLUSION

¶ 63     For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 64     Affirmed.