**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240329-U

Order filed January 21, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| OKSANA KAIRE, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Petitioner-Appellee, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-24-0329 |
| | ) | Circuit No. 23-OP-2748 |
| | ) | |
| PAUL MURPHY, | ) | Honorable |
| | ) | Thomas Slazyk, |
| Respondent-Appellant. | ) | Domenica A. Osterberger, |
| | | Judges, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   We affirm the trial court's decision to enter a plenary order of protection in favor of petitioner and against respondent. We decline to award attorney fees. Affirmed.

¶ 2     The trial court, Judge Thomas Slazyk, entered a plenary order of protection in favor of petitioner-appellee Oksana Kaire and against respondent-appellant Paul Murphy, commencing February 20, 2024, at 10:53 a.m. and ending February 20, 2026, at 5 p.m. Later, the trial court, Judge Domenica A. Osterberger, ordered Murphy to pay Kaire $5225 in attorney fees and costs

incurred in obtaining the order of protection. Murphy appeals, arguing that the order of protection violated the requirement set forth in the Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.*) (West 2022)) that such orders "shall be valid for a fixed period of time, *not to exceed two years.*" (Emphasis added.) *Id*. § 220(b)(0.05). Murphy also argues that the underlying finding of abuse was against the manifest weight of the evidence. Kaire responds that Murphy's appeal is frivolous and requests appellate attorney fees. For the reasons that follow, we affirm the trial court's judgment and order of protection but decline to award appellate attorney fees.

¶ 3                                                    I. BACKGROUND

¶ 4        On November 8, 2023, Kaire petitioned for a plenary order of protection "No Stalking No Contact" order against Murphy, her next-door neighbor, for the protection of herself, her husband, and her five-year-old son. In it, she alleged that, in November 2023, "We were cleaning up our front yard and [Murphy] was drunk and started screaming and using obscene word and verbal threats about burning our house down and killing him. He throws garbage in our yard and urinates on my property." She also alleged: "[Murphy] has broken our fence at eye level with my 5[-]year [-]old son. He pees on our fence and my son is afraid to go outside because of [Murphy] and his foul mouth and bad behavior."

¶ 5        At a two-day hearing ending February 20, 2024, the following witnesses testified for Kaire: Kaire, Rimas Kairys (Kaire's husband), Evelyn Jones (a neighbor to both parties), Olga Bourgouris (a friend), and James Boudouris (a friend). Murphy and his wife, Julie Murphy, testified for Murphy.

¶ 6        Kaire testified that, approximately five years earlier, she came to the United States from Eastern Europe. According to Kaire, Murphy, her neighbor, began harassing her family almost immediately. She called the police on multiple occasions and, most recently, they recommended

2

that she petition for the instant order of protection. Focusing on events occurring in and after November 2023, Kaire testified that Murphy repeatedly urinated into her yard by placing a funnel through the fence that separated their properties. Kaire saw this occur from a window on the second level of her house. She also saw and smelled the resulting puddle of urine. Kaire's five-year-old son was also looking out of the window, and she made him turn away. Nevertheless, she believed her son would have been able to see Murphy's genitals, as Murphy's pants were pulled down to his knees. Kaire believes her son to be afraid of Murphy, because if her son sees Murphy, he will hide inside the house or even in the car. Murphy has called her son a "little moron." Murphy has told Kaire and her family to "get out" of America. Later that winter, Murphy shoveled snow from his own driveway onto Kaire's driveway. Kaire's husband had recently been hospitalized due to illness and it was difficult for the family to remove the (additional) snow. A neighbor had to help them.

¶ 7   Kaire testified that, on another occasion, she witnessed Murphy, drunk, kicking the fence and laughing at her husband for using a small leaf blower. Her husband asked Murphy to go inside but Murphy swore at him and said, "Kiss my d***."

¶ 8   When Kaire's family was outside putting up holiday decorations and her son saw Murphy come outside, her son ran and got into the car. Kaire asked her son what was wrong, and he said he did not want Murphy to yell at him again.

¶ 9   On cross-examination, Kaire acknowledged that she did not see Murphy *break* the fence and the fence was not in good condition regardless of Murphy's alleged actions.

¶ 10   Rimas Kairys, Kaire's husband, testified consistent with Kaire that there was a funnel from Murphy's side of the fence to theirs. Rimas was certain by the appearance and smell that urine had pooled on his side of the fence. Rimas confirmed that, as he used a small leaf blower, Murphy

3

kicked the fence, calling him a "stupid Russian." Rimas also confirmed that Murphy shoveled snow to block his driveway. However, Rimas has not heard Murphy threaten his family on or after November 1, 2023.

¶ 11        Evelyn Jones testified that she was a neighbor of 12 years to Murphy and of 5 years to Kaire and Rimas. She witnessed Murphy shovel snow 10 feet from his own driveway and place it over a drainage area in front of Kaire's driveway such that snow and ice backed up onto Kaire's driveway. The snow was piled three feet deep at parts and Jones helped remove it. Rimas tried to help, but he was ill. Murphy had not placed snow like that before Kaire moved into the home. Based on what she had witnessed, Jones was afraid for the safety of Kaire's family.

¶ 12        Olga Bourgouris, a friend of Kaire's, testified that she was outside Kaire's home when she saw Murphy pull into his own driveway. When Kaire's five-year-old son saw Murphy, he immediately hid, running into his own family's car. The five-year-old seemed afraid. Kaire also seemed nervous and afraid around Murphy.

¶ 13        Julie Murphy, Paul's wife, testified to the leaf-blower incident. According to Julie, Murphy called her outside to look at Rimas's leaf blower, because it was so small. They "made fun" and laughed amongst themselves outside on their side of the fence. They did not shout at Rimas. Rimas, in contrast, spit at Murphy. Neither Kaire nor her son were present, but Julie acknowledged that they may have seen the interaction from inside their house. Julie has never heard Murphy threaten Kaire, nor has she heard him say anything of a "mean or nasty" nature to Kaire's five-year-old son, stating, "[o]h, heavens, no."

¶ 14        Murphy testified that he was 54 years old and operates heavy equipment for a living. He had lived at his current residence for 27 years. He agreed that he brought his wife outside to look at the "itty bitty" leaf blower. However, it was Rimas, not he, who yelled. Rimas also spit at him,

4

and the spit landed on his chest. He agreed that he put the funnel through the fence, but he only meant to rest it there after working with oil waste. He forgot to remove it. He denied urinating in it. Murphy testified that he never urinated on the fence or Kaire's property. He never damaged the fence. Murphy testified that he placed the snow from his driveway onto the street, because in prior years Kaire had complained to the police that he put the snow on her grass. Murphy explained that he placed the snow as directed by the officers.

¶ 15    Kaire re-called Jones in rebuttal to impeach Murphy. Contrary to Murphy's testimony that he never urinated on Kaire's property, Jones saw him twice urinate on Kaire's property. Jones did not see the actual urine, but she saw Murphy leaning against the fence, pull up his zipper, and scurry into his garage upon noticing Jones watching him. Contrary to Murphy's testimony that he never damaged Kaire's fence, Jones saw him trying to remove the fence as Kaire and Rimas were putting it up. Finally, as to the placement of the shoveled snow, Murphy used a four-wheeler to move "large," knee-high amounts of snow onto Kaire's property. James Boudouris, a friend of Kaire's, also testified for purposes of impeaching Murphy on the issue of urination. In early July, Boudouris saw Murphy in a posture near the fence that looked like he was urinating.

¶ 16    Murphy testified again on his own behalf, to rebut Jones's testimony. He again denied ever urinating through Kaire's fence or otherwise damaging it.

¶ 17    The trial court granted Kaire's petition for a plenary order of protection. The form written order provided that the order issued February 20, 2024, at 10:53 a.m. and would remain in effect until February 20, 2026, at 5:00 p.m. It further provided: "Upon examination of the Verified Petition, [Kaire] under oath, and other evidence, [Kaire] is the victim of two or more acts of following, monitoring, observing, surveilling, threatening, communicating, or inferring or damaging property or pets by [Murphy]."

5

¶ 18    Orally, the trial court had explained:

"Okay. Well, we have two different stories.  One is the Petitioner saying that, when she moved in, it's been a terrible experience.  There's puddles of urine on her side of the yard.  She's actively seen him urinating, saw genitals; xenophobic language about her ethnicity; son doesn't go outside; calls *** her son a little moron; thrown mud and leaves over the fence.  You know, and then we have the Respondent who says none of it ever happened.

*I don't know who to believe*.  Except, we have a third party, [Evelyn] Jones, who, by everybody's account, doesn't—well, there's been no evidence to show that, in fact, she dislikes the Respondent.  In fact, she said I think on cross examination that she exchanged pleasantries with him.  There's been no motive as to why she would lie.

So she took the stand and she said *** she saw a grown man leaning up against the fence or leaning towards the fence. And then when he turned around, he's zippering up his pants.  So either he has a very loose zipper on two separate occasions, or he's doing something that he shouldn't be.  [A] common inference can be made that if a man is up against the fence and he's zippering up his pants, [there is] a good likelihood that he's peeing.  At least by a preponderance of the evidence, I can say that.  But beyond a reasonable doubt, we're not here for that.  ***.

So—and she talked about the snow, but I'm really concerned just about the urinating.  *It goes to the credibility of who I'm going to believe*.

So[,] I'm going to find that a Stalking No Contact is going to be needed just based on the evidence that I've heard from Ms. Jones.  She sort of said it straight.  ***.

So[,] taking into consideration the nature, frequency, severity, pattern, and consequence of the Respondent's past abuse, neglect, or exploitation of the Petitioner, the Court finds that the conduct or action of the Respondent, unless prohibited, will likely cause irreparable harm or continued abuse. It is necessary to grant the request of relief in order to protect the Petitioner and other protected—other protected parties. So[,] it will be a two-year Stalking No Contact Order entered." (Emphases added.)

The trial court subsequently entered a $5225 judgment against Murphy for attorney fees and costs. This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20        On appeal, Murphy argues that the order of protection violated the requirement set forth in section 220(b)(0.05) of the Act that such orders "shall be valid for a fixed period of time, not to exceed two years." 750 ILCS 60/220(b)(0.05) (West 2022). Murphy also argues that the trial court's decision to enter the no stalking, no contact plenary order of protection was against the manifest weight of the evidence. Kaire responds that Murphy's appeal is frivolous and requests attorney fees pursuant to Rule 375(b) and section 214(b)(13) of the Act. *Id*. § 214(b)(3). For the reasons that follow, we affirm the trial court's judgment and order of protection but decline to award attorney fees.

¶ 21                              A. Section 220(b)(0.05)

¶ 22        Section 220(b)(0.05) of the Act provides that "[a] plenary order of protection entered under this Act shall be valid for a fixed period of time, not to exceed two years." *Id*. § 220(b)(0.05). Murphy argues that the order exceeded the two-year statutory term by several hours, because it was entered on February 20, 2024, at 10:53 a.m., and was set to expire on February 20, 2026, at 5 p.m. Murphy's argument that the statute requires terms to be measured in hours and minutes, as

7

opposed to years, presents a question of statutory interpretation. The best way to interpret the legislature's intent is to look to the plain language of the statute. *Dale v. Bennett*, 2021 IL App (4th) 200188, ¶ 32. We review questions of statutory interpretation *de novo*. *Sadler v. Service*, 406 Ill. App. 3d 1063, 1065 (2011).

¶ 23 Typically, when an Illinois statute sets forth a timeframe measured in years, the end date is the same month and day, here, February 20, that the judgment was entered, plus the appropriate number of years, here two. See *Parker v. Murdock*, 2011 IL App (1st) 101645, ¶ 21 (when a judgment was entered October 13, 2004, a petition for relief from judgment filed October 13, 2006, fell within the statutory two-year period.) Moreover, Illinois law typically does not recognize fractions of a day. See *Pekin Insurance Co. v. Harvey*, 377 Ill. App. 3d 611, 614 (2007); *Conley v. Ratayzcak*, 92 Ill. App. 3d 29, 34 (1980). We note, as to orders of protection in particular, that, after the initial two-year term, a trial court may order an extension of indefinite length. *Dale*, 2021 IL App (4th) 200188, ¶ 36 (construing 750 ILCS 60/220(e) (West 2022)).

¶ 24 Section 220(b)(0.05) computes time in terms of calendar years. 750 ILCS 60/220(b)(0.05) (West 2022). Therefore, neither the number of days, nor the fraction of days, controls. If the hours and minutes set forth within the order are disregarded, the order of protection simply runs from February 20, 2024, to February 20, 2026, in compliance with the statute.

¶ 25 In his reply brief, Murphy does not expressly dispute these principles but merely notes they have yet to be applied in an order of protection case. The Act itself indicates a willingness to extend the two-year period should the two-year mark fall on a holiday. *Id*. § 220(f) ("[a]ny order of protection which would expire on a court holiday shall instead expire at the close of the next court business day[.]") The ending time of the new date does not mirror the hour and minute of the starting time but, rather, defaults to the end of the business day. Seizing on this, Murphy argues

for the first time in his reply brief that, even if the court was not required to end the order of protection at 10:53 a.m., the order of protection should end not at 5 p.m. but at 4:30 p.m., when the courthouse closes. Murphy cites no authority for the proposition that this new discrepancy, if it can be called that, would warrant vacating the order. Parenthetically, we observe that courts often facilitate the issuance of orders of protection outside standard courthouse hours. In this case, on February 20, 2024, at 5:16 p.m., the parties filed a stipulated clarification to the order of protection, wherein they acknowledged that, because Murphy's residence was located within 100 feet of Kaire's driveway, Murphy would not violate the order of protection by virtue of being on his own property so long as he did not commit the acts prohibited by the order. Having rejected Murphy's statutory argument, we turn to the evidence supporting the plenary order of protection.

¶ 26                                 B. Sufficiency

¶ 27        A petitioner seeking a plenary order of protection must prove her case by a preponderance of the evidence. 750 ILCS 60/205(a) (West 2022). A preponderance of the evidence is proof that leads the fact finder to find the existence of the issue in fact is more probable than not. *In re R.G. and A.M.*, 2012 IL App (1st) 120193, ¶ 31. A trial court's determination that a petitioner seeking an order of protection has proved her case by a preponderance of the evidence will not be reversed unless it is against the manifest weight of the evidence. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). A decision is against the manifest weight of the evidence only if the opposite result is clearly apparent or it is unreasonable, arbitrary, or not based on the evidence. *Id*. We defer to the trial court in its role to assess the credibility of the witnesses, draw reasonable inferences from their testimony, and generally consider the weight and quality of the evidence. *Id*. at 350-51. As such, we will not substitute our judgment for that of the trial court on these points. *Id*.

¶ 28    Murphy argues that the order of protection was entered contrary to the manifest weight of the evidence. He notes that Kaire never testified to the "most troubling" allegation set forth in her written petition that Murphy threatened to burn down her home and kill her husband or her son. In fact, Rimas testified that Murphy did not threaten him in such a manner after November 1, 2023. He also argues that the trial court itself stated that it did not know which side to believe and instead relied solely on the testimony of Jones. Jones admitted that she never saw actual urine. In any event, urinating on a person's property was not egregious enough behavior to warrant an order of protection.

¶ 29    Murphy's argument fails to recognize Kaire's burden of proof at trial. Arguably, Kaire's case would have been stronger if she had testified in complete congruence with her written petition. Despite not testifying that Murphy threatened to burn down her house, Kaire did testify to other behavior substantiating the trial court's finding that "[Kaire] is the victim of two or more of the following, monitoring, observing, surveilling, threatening, communicating, or inferring or damaging property or pets by [Murphy]." Kaire and other witnesses testified that Murphy repeatedly urinated on her property, damaged her fence, exposed himself to a five-year-old while urinating, demeaned and yelled at a five-year-old, caused the five-year-old to hide in fear, shouted xenophobic comments to her and her family, mocked her family, and harassed her through the placement of snow.

¶ 30    Murphy's argument takes out of context the trial court's statement that it did not know which side to believe. In making that statement, the court merely acknowledged that this was a "he said/she said" case such that, without Jones's testimony, it would have been a factually closer case. However, Jones's testimony corroborated Kaire's testimony on multiple points—the urination, the fence damage, and the snow shoveling. Therefore, the court credited Kaire's version

10

of events. The court did not grant an order of protection based solely on urination. Jones's testimony that she witnessed Murphy acting as though he had just urinated into Kaire's property (by his posture, pant zipping, and "scurrying" into his garage) served to corroborate Kaire's version of events and discredit Murphy's version of events. The trial court's finding that Kaire proved her case by a preponderance of the evidence is certainly not against the manifest weight of the evidence.

¶ 31    Nevertheless, we decline to award attorney fees for the costs of appeal pursuant to Rule 375(b) (eff. Feb. 1, 1994) or section 214(b)(13) of the Act. 750 ILCS 60/214(b)(13) (West 2022). Section 214(b) provides that the remedies to be included *in an order of protection* shall be determined in in accordance with this and other sections of the Act, including, pursuant to subsection (b)(13), authorizing the court to order respondent to pay for losses suffered as a direct result of the abuse, including reasonable attorney fees. *Id.* Rule 375(b) authorizes an appellate court to sanction a party who brings, *inter alia*, a frivolous appeal. Rule 375(b) (eff. Feb. 1, 1994). An appeal is frivolous if "it is not reasonably grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." *Id.* A frivolous appeal is one that would not be brought in good faith by a reasonable, prudent attorney. (Quotation marks omitted.) *Thompson v. Buncik*, 2011 IL App (2d) 100589, ¶ 21.

¶ 32    Initially, we observe without deciding that the plain language of section 214(b) appears to envision remedies included in, or issued in conjunction with, the issuance of an order of protection as opposed to an appeal of the same. 750 ILCS 60/214(b) (West 2022). Rule 375(b) provides sufficient authority to award attorney fees for frivolous appeals. While Murphy's statutory argument approaches frivolity, he did cite some relevant case law and, at this juncture, we give his attorney the benefit of the doubt that the initial failure to account for the general rule that Illinois

11

law does not recognize fractions of a day was an oversight, rather than an imprudent course of action.

¶ 33                                    III. CONCLUSION

¶ 34        The judgment of the circuit court of Will County is affirmed.

¶ 35        AFFIRMED.